## 18873

Elmer David MAW, Respondent, v. Arthur F. McALISTER, a minor over 14 years of age, and Mrs. A. F. McAlister, Appellants

(166 S. E. (2d) 203)

*Messrs. Leatherwood, Walker, Todd & Mann,* of Green-
ville, and *George L. Grantham,* of Easley, *for Appellants,*

*Messrs. Abrams, Bowen & Townes,* of Greenville, and *W. G. Acker,* of Pickens, *for Respondent,*

*Messrs. James N. Watson and Leatherwood, Walker, Todd & Mann of Greenville, and George L. Grantham,* of Easley, for *Appellants, in reply,*

February 18, 1969.

BRAILSFORD, Justice.

This is an appeal from a judgment for plaintiff for $40,000.00 for personal injuries sustained in a motor vehicle collision on August 7, 1965. The defendants pled an "Agreement and Release," duly excuted by plaintiff and by defendants' insurance carrier on August 26, 1965, as a bar to the tort action. The written agreement, by its unambiguous terms, released and discharged defendants from all liability to plaintiff arising out of the collision. The consideration for the discharge of the tort claim was the sum of $265.50 paid to plaintiff by the insurance carrier and its promise to pay all medical expenses incurred by plaintiff within one year following the accident, not exceeding $2,000.00, and its promise to pay plaintiff at the rate of $15.50 per day for any time lost from work within 180 days following the accident.

Apparently by agreement of the parties, plaintiff filed a reply to the plea in bar alleging that he had been induced to sign the agreement by the fraud and deceit of the carrier's agent, who falsely represented to him that the release which he was requested to sign related only to his claim for property damage and did not affect his claim for personal injury. Under our view of the case, the only issue which we need to decide is whether the court should have sustained the plea in bar and granted the defendants' timely motion for a directed verdict.

Since the decision of this court in *J. B. Colt Co. v. Britt*, 129 S. C. 226, 123 S. E. 845 (1924), "(we) have consistently followed the rule that ordinarily one cannot complain of fraud in the misrepresentation of the contents of a written instrument signed by him when the

truth could have been ascertained by reading the instrument, and that one entering into a written contract should read it and avail himself of every reasonable opportunity to understand its content and meaning." *O'Connor v. Brotherhood of Railroad Trainmen,* 217 S. C. 442, 449, 60 S. E. (2d) 884, 886.

The duty on the part of one who signs a written instrument "to exercise reasonable care to protect himself requires that he read the contract which he signs and, if he cannot read, that he get some one to read it for him. While the failure of the defrauded party to read his contract before signing, or to have it read for him, will ordinarily bar him of recovery, this is not an absolute rule. It is subject to the just doctrine that a wrongdoer cannot shield himself from liability by asking the law to condemn the credulity of the ignorant and the unwary. *Thomas v. American Workmen, supra,* 197 S. C. 178, 14 S. E. (2d) 886." *Parks v. Morris Homes Corp.,* 245 S. C. 461, 467, 141 S. E. (2d) 129, 132.

The plaintiff in *Parks* was an ignorant negro woman of no business experience. It was held that the issue of fraud was properly submitted to the jury under the liberal rule of *Thomas v. American Workmen,* 197 S. C. 178, 14 S. E. (2d) 886, 136 A. L. R. 1 favoring the "ignorant and unwary."

The opposite result was reached in *Parnell v. United Am. Ins. Co.,* 246 S. C. 26, 142 S. E. (2d) 204, in which the plaintiff was forty-three years of age, had finished the tenth grade in school, was an Avon Products saleswoman and had previously been a textile worker. Judgment in favor of the defendant *non obstante veredicto* was sustained upon the ground that plaintiff was guilty of a reckless disregard of her duty in the premises by signing an application for an insurance policy without reading it and could not complain that the agent fraudulently inserted false answers therein. This decision followed *Gordon v. Fidelity and Casu-*

*alty Co. of N. Y.,* 238 S. C. 438, 120 S. E. (2d) 509; *Branham·v. Capital Life & Health Inc. Co.,* 220 S. C. 67, 66 S. E. (2d) 451; *O'Connor v. Brotherhood of Railroad Trainmen, supra,* 217 S. C. 442, 60 S. E. (2d) 884, and numerous other decisions of this court which have applied the general rule quoted above from the *O'Connor* case. Plaintiff's attempt to bring himself within the exception to the rule by testimony that he can not read must fail. The record conclusively establishes that he is a person of intelligence and above average experience. He offers no excuse for his signing the agreement without having it read to him except his statement that he had complete confidence in the insurance adjuster.

At the time of this transaction plaintiff was forty-three years of age. He had been employed by the same textile plant for twenty years and was earning between $110.00 and $130.00 per week. In addition, he owned and operated a grocery store. For about five years he had purchased merchandise for sale in this store under a written contract with an organization known as A. G. Grocers of Greenville, South Carolina. He was also an experienced, large scale broiler producer. Shortly before the accident he increased the capacity of his broiler plant from 12,000 birds to 31,000 and fully automated it at a cost of $39,000.00. He borrowed $8,000.00 of this amount from his bank on two open notes, one for $3,000.00 and one for $5,000.00. He gave a mortgage to a supplier for $3,397.57 covering the purchase price of part of the equipment and, apparently, paid for the remainder in cash. For some four years prior to the trial he sold his broilers to Blueridge Poultry Company of Seneca under a written contract. Previously, he had had a similar contract with another organization. In 1950 he purchased a seven acre tract of land for cash and constructed his family dwelling on it without mortgage financing.

It is conceded that plaintiff attended school "to the eighth grade" but he and his wife testified that he is unable to read

and that she customarily reads business correspondence and documents to him. However, on cross-examination he demonstrated his ability to read figures by reading the figures $265.50, $15.50 and $2,000.00 from the agreement in question.

The release was signed at plaintiff's home nineteen days after the accident. There is no suggestion that he was disadvantaged at that time in the transaction of business by the injuries he had sustained. The plaintiff knew that the insurance adjuster who presented the release, a stranger to him, represented the tort feasor's insurance carrier. Only the adjuster, plaintiff and plaintiff's wife were present when the release was presented for signing. At the adjuster's request, Mrs. Maw went for a sister-in-law to act as a witness. Plaintiff had obtained an estimate of the damage to his vehicle, and he and the adjuster agreed upon $165.50 as a proper figure.

The foregoing facts are undisputed. In our remaining statement, we resolve all conflicts in the testimony in favor of plaintiff.

The adjuster wanted plaintiff's wife to join in signing the release and stated that he was including $100.00 for her in the settlement. He told them that the release, which was on a one page printed form, related to the truck only and proposed that they settle this part of the claim and defer settlement for plaintiff's personal injuries. Plaintiff was unwilling to settle for such injuries at that time because his back was still hurting, and he had not been discharged by his doctor. When plaintiff's wife signed the instrument, the adjuster folded it down from the top so that she could not read it. We quote from plaintiff's testimony:

"Q. Did you rely on what he told you?
"A. Yes, sir.
"Q. Did you believe what he told you?
"A. Yes, sir. One hundred percent.

"Q. All right. Now, how did you get your sister-in-law for a witness?

"A. Well, my wife went and got her.

"Q. Did he make any statement to you when your wife went out of the house?

"A. He told me to turn, to fold that paper down where my sister-in-law couldn't see it, couldn't even read what she was signin'.

"Q. Did he tell you to do that?

"A. Yes, sir, he told me to do that.

"Q. All right. Did he tell you why?

"A. He didn't tell me why.

"Q. What did you do?

"A. I done what he said do.

"Q. Did you turn it down so she couldn't read it?

"A. Yes, sir.

"Q. After she came in to witness it did he make any statement in front of her?

"A. Yes, sir, he told her that it was a truck release she was signing and a truck release only.

"Q. Did she then witness it?

"A. Yes, sir.

"Q. Would you have signed that paper if you had had any idea it was anything other than a truck release?

"A. No, sir, I wouldn't."

Plaintiff, a mature, experienced businessman, was under no disadvantage in dealing with a stranger whom he knew to represent adverse parties. He had no right to rely upon the adjuster's representation as to the contents of the writing. It was his duty to avail himself of the means at hand to discover the truth. He could easily have done so by having his wife read the paper for him as she was wont to do. In fact, a casual inspection of the paper by plaintiff himself would have revealed to him the inclusion of figures which belied the adjuster's representation as to the nature of the instrument.

In spite of suspicious circumstances attending the execution and witnessing of the document, plaintiff completely disregarded his duty to look out for his own interest. He does not even claim that his omission resulted from his inability to read. Instead, he says that he had implicit confidence in the adjuster. Without any circumstances of compulsion, plaintiff, in effect, shut his eyes and took a chance on a stranger representing adverse interests. Under the decisions of this court which have been cited, such conscious or reckless disregard of his duty must be held to bar plaintiff's claimed right to rescind the agreement in question for fraud.

This conclusion makes it unnecessary for us to decide whether a verdict should have been directed for defendants on the further ground that plaintiff failed to tender a return of the cash portion of the consideration for the release before seeking its rescission. The other issues raised by the appeal have become moot.

Reversed.

Moss, C. J., AND LEWIS, BUSSEY AND LITTLEJOHN, JJ., concur.