930 F.2d 23
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Wade JONES, Plaintiff-Appellee,
v.
JIM WALTER HOMES, INC., Defendant-Appellant.
 No. 89-2926.
 United States Court of Appeals, Fourth Circuit.
 Argued Jan. 9, 1991.
Decided April 9, 1991.
 
 Appeal from the United States District Court for the District of South Carolina, at Florence. Matthew J. Perry, Jr., District Judge. (CA-88-1423-4-0)
 Ray Linnaeus Derrick, Funderburk & Derrick, Irmo, S.C., for appellant.
 Dirk Julius Derrick, Stevens, Stevens & Thomas, P.A., Loris, S.C., for appellee.
 D.S.C.
 AFFIRMED.
 Before DONALD RUSSELL, WIDENER and CHAPMAN, Circuit Judges.
 PER CURIAM:
 
 
 1
 Plaintiff Wade Jones, who is "educably retarded," alleges that defendant Jim Walter Homes (JWH) showed him two different types of prefabricated houses and then, while promising to construct him a house similar to those shown, induced him to sign a contract purchasing only a "basic shell." Defendant then poorly constructed the contracted-for house, induced Jones into signing an incorrect, updated completion slip, and, when Jones complained at these actions, threatened to take away his house and land if mortgage payments were not forthcoming. Jones thereafter brought suit in the United States District Court for the District of South Carolina alleging numerous causes of action. Most of these causes were submitted to a jury, which returned a verdict in favor of Jones for $17,500 actual damages and $100,000 punitive damages. Defendant now appeals only the punitive damage award. Finding no error below, we affirm.
 
 I.
 
 2
 On August 31, 1987, plaintiff Wade Jones visited defendant JWH's business in Florence, South Carolina, to look at model houses. Jones possesses an IQ of 72, thereby intellectually functioning in the "educably retarded" range, completed only the seventh grade, and reads at the level of a child seven years, ten months of age (second grade, fifth month). Upon Jones' arrival at the business, he was met by JWH salesman Caesar McGill. McGill showed Jones a brochure depicting the "Monte Carlo" style house and then took him onto the lot to view a "Wellington" model that was complete except for paneling and flooring. Jones was told that he could buy a "Monte Carlo" model with all the exterior features shown on the brochure, minus door stoop and door rails, and the same interior features as in the "Wellington" he had just seen, except for a water heater, for $23,350. Jones agreed to this, and the two men entered into McGill's office to complete the paper work. McGill handed Jones a building contract and other documents to sign, and when Jones indicated that he could not read all the "big" words these contained, McGill told him that everything promised was in the contract. Relying on McGill's statements, Jones signed the contract and other documents.
 
 
 3
 According to expert testimony at trial, the building contract signed by Jones requires a reading capability beyond the eleventh grade, third month. It contains JHW's own terminology, e.g., "basic shell," which is not therein defined, and it contains language allowing options to be purchased without having them listed in the contract. In fact, JWH's own expert at trial had trouble deciphering exactly what electrical options the contract indicated Jones was to receive.
 
 
 4
 JWH finished laying the foundation to Jones' house on January 2, 1988. That day, a JWH employee induced Jones to sign a completion and satisfaction slip dated January 2, 1988, by misrepresenting to him that it was only a release as to the foundation. Later, this slip was filled in by JWH to show that the house had been completed on December 18, 1987--this, despite the fact that on January 2, 1988, only the foundation was present.
 
 
 5
 On January 16, 1988, JWH quit work on Jones' house. It then consisted of a roof, siding, and some two-by-fours in the interior. Features expected by Jones that were not present included sheetrock, light fixtures, sinks, baths, a laboratory, a meter box, the electrical package, and interior doors. Jones visited the house soon after the workman left, and he found a set of keys hanging from a broken door frame. Jones contacted JWH to let them know that one of their workers had left the keys, and at this time he was informed that the keys were his; JWH had supposedly completed what he had agreed to buy.
 
 
 6
 Shortly thereafter, Jones went to visit JWH's office, and there, representatives of the company, using the building contract and the completion slip, told him that he was not entitled to those features he had earlier seen on the "Wellington" model. Instead, Jones was shown, for the first time, a model styled a "basic shell," and he was told that this was what he had contracted to buy; during Jones' first visit to JWH, a "basic shell" was on the company's lot, but salesman McGill conveniently forgot to show it to Jones. It should be noted, also, that even for a "basic shell," Jones' house was not finished, because it had not been painted, and JWH's own expert at trial labeled the workmanship on Jones' house "poor."
 
 
 7
 The contract in question called for the first payment to come due on the 5th day of the first month which began 30 days after completion of the house. Thus, on March 9, 1988, JWH contacted Jones and told him that his first payment was four days late. When Jones replied that he was not going to pay because JWH had not completed its part of the bargain, an employee of JWH's mortgage department told Jones that if he did not pay, JWH would take his house and land. Under this threat, Jones began making payments.
 
 
 8
 On May 2, 1988, Jones filed an action against JWH in the United States District Court for the District of South Carolina. As amended, Jones' complaint alleged causes of action for fraud; breach of implied warranty of habitability and fitness for intended purpose; breach of implied warranty of workmanship; breach of express warranty; breach of the mortgage contract; breach of the building contract; breach of contract accompanied by fraudulent act; negligence; and violation of the South Carolina Unfair Trade Practices Act.
 
 
 9
 At trial, the court directed a verdict in favor of Jones on the breach of mortgage contract cause of action, and Jones withdrew his causes of action for breach of express warranty and negligence. Despite directed verdict motions by JWH, the court allowed the other causes of action to go to the jury. The jury returned a verdict in favor of Jones for $17,500 actual damages and $100,000 punitive damages. JWH then made j.n.o.v. and new trial motions, which were denied by the court.
 
 
 10
 On appeal, JWH contests only the punitive damage award. Of the causes of action given to the jury, the ones for fraud and breach of contract accompanied by fraudulent act give rise to possible punitive damages. JWH argues that it was error for the court to allow both of these causes of action to go to the jury. However, in considering the evidence in the light most favorable to Jones, we find that evidence exists reasonably supporting the jury's verdict based upon the cause of action for fraud; because of this holding, we need not determine the sufficiency of the evidence for the breach of contract accompanied by fraudulent act cause. JWH also believes the punitive damage award was excessive, but we find that the district court did not abuse its discretion in upholding the amount of the award.
 
 II.
 
 11
 In South Carolina, one must prove nine distinct elements to recover in an action for fraud: (1) a misrepresentation; (2) its falsity; (3) its materiality; (4) the defendant's knowledge of its falsity; (5) the defendant's intent that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) his reliance on its truth; (8) his justifiable reliance; and (9) his consequent and proximate injuries. Outlaw v. Calhoun Life Ins. Co., 236 S.C. 272, 113 S.E.2d 817, 818 (1960). JWH argues that Jones could not have justifiably relied on the misrepresentation because he failed to read, or have read to him, the building contract.
 
 
 12
 In general, South Carolina courts take many factors into account when determining whether a reliance was justifiable.
 
 
 13
 Whether or not reliance upon a representation in a particular case is justifiable or excusable, what constitutes reasonable prudence and diligence with respect to such reliance, and what conduct constitutes a reckless or conscious failure to exercise such prudence, will depend upon the various circumstances involved, such as the form and materiality of the representation, the respective intelligence, experience, age, and mental and physical condition of the parties, the relation and respective knowledge and means of knowledge of the parties, etc.
 
 
 14
 J.B. Colt Co. v. Britt, 129 S.C. 226, 123 S.E. 845, 848 (1924); Guy v. National Old Line Ins. Co., 252 S.C. 47, 164 S.E.2d 905, 908 (1968).
 
 
 15
 As for the failure to read a written contract, usually this is fatal to a claim of justifiable reliance upon an oral misrepresentation. As stated by the South Carolina Supreme Court:
 
 
 16
 We have consistently followed the rule that ordinarily one cannot complain of fraud in the misrepresentation of the content of a written instrument when the truth could have been ascertained by reading the instrument, and one entering into a written contract should read it and avail himself of every reasonable opportunity to understand its content and meaning.
 
 
 17
 Gordon v. Fidelity & Casualty Co. of N.Y., 238 S.C. 438, 120 S.E.2d 509, 513 (1961); Guy, 164 S.E.2d at 906-07.
 
 
 18
 A major exception to this rule, though, is if the plaintiff is "ignorant and unwary." In the seminal case of Thomas v. American Workmen, 197 S.C. 178, 14 S.E.2d 886, 887 (1941), the state Supreme Court held:
 
 
 19
 The policy of the courts is, on the one hand, to suppress fraud, and on the other, not to encourage negligence and inattention to one's own interest. Either course has obvious dangers. But the unmistakable drift is toward the just doctrine that a wrongdoer cannot shield himself from liability by asking the law to condemn the credulity of the ignorant and unwary.
 
 
 20
 Since Thomas, South Carolina courts have consistently recognized this exception. See, e.g., Weatherford v. Home Finance Co., 225 S.C. 313, 82 S.E.2d 196, 199 (1954); Parks v. Morris Homes Corp., 245 S.C. 461, 141 S.E.2d 129, 132 (1965); Parnell v. United American Ins. Co., 246 S.C. 26, 142 S.E.2d 204, 207-08 (1965); Maw v. McAlister, 252 S.C. 280, 166 S.E.2d 203, 205 (1969); Allen-Parker Co. v. Lollis, 257 S.C. 266, 185 S.E.2d 739, 743 (1971); Elders v. Parker, 286 S.C. 228, 332 S.E.2d 563, 567 (Ct.App.1985); Burwell v. South Carolina Nat'l Bank, 288 S.C. 34, 340 S.E.2d 786, 789 (Ct.App.1986); Austin v. Independent Life and Acc. Ins., 296 S.C. 156, 370 S.E.2d 918, 921 (Ct.App.1988).
 
 
 21
 As noted above, the general factors to be considered when determining whether a reliance was justifiable include "the form and materiality of the representations, the respective intelligence, experience, age, and mental and physical condition of the parties, and the relation and respective knowledge and means of knowledge of the parties." Thomas, 14 S.E.2d at 888. In evaluating whether one is ignorant and unwary, the South Carolina Court of Appeals appears to place an emphasis on three of these factors: the individual's education, business experience, and intelligence. Burwell, 340 S.E.2d at 790; Austin, 370 S.E.2d at 921. Of course, in determining this issue, "the facts of each case [will be] different. Each [case] must necessarily be decided upon its own unique facts." Weatherford, 82 S.E.2d at 199. Thus, it is instructive to review the prior cases involving the ignorant and unwary exception.
 
 
 22
 In the reported cases which have upheld a jury's consideration of the exception, the individuals in question have had very little schooling and also little previous business experience. In Thomas, the plaintiffs were illiterate and "utterly without experience in business transactions." 14 S.E.2d at 887. Likewise, Carrie Lee Parks had completed only the third grade, could read "very little," and "was of very limited education and business experience." Parks, 141 S.E.2d at 132. Corine H. Ashley Lollis, a forty-eight year old unmarried woman employed by a shirt manufacturing firm, could only read and write "some," having attended the sixth grade. Allen-Parker, 185 S.E.2d at 743. The court described Mae Elders as a "credulous, trusting person" who "lacks book learning as well as schooling in the ways of the world." Elders, 332 S.E.2d at 567. Also, Mack Weatherford "had no education beyond the second grade at school, and could not read." Weatherford, 82 S.E.2d at 197. Finally, Emmaline Austin was an illiterate sharecropper who had no formal education. Austin, 370 S.E.2d at 921.
 
 
 23
 By contrast, those determined not to fall under the exception have either been well schooled or have had extensive business experience. The court noted that Elizabeth T. Parnell was "not an illiterate person, but one of normal intelligence." She had completed the tenth grade and was "employed as a representative selling Avon Products." Parnell, 142 S.E.2d at 205, 208. Although Harvey Branham had only completed the fifth grade, "he was a carpenter, qualified to build a house, a farmer, and[,] in association with his wife, a storekeeper." The court found that the testimony left "no doubt about the fact that however inadequate his formal education may have been, [Branham's] business experience qualified him to read and understand his policy and the limitations of liability contained therein." Branham, 66 S.E.2d at 454. Similar to Branham was Elmer David Maw, who attended school up until the eighth grade. Maw testified that he could not read, but the court found that he was "a person of intelligence and above average experience;" he had been employed by the same textile plant for twenty years, "owned and operated a grocery store," and was an "experienced, large scale [31,000 birds] broiler producer." Maw, 166 S.E.2d at 205. Finally, the state Court of Appeals found that Lewis C. Burwell could not be classified as ignorant and unwary, considering that he had "held directorship positions with companies both in the United States and abroad," and was a graduate of The University of the South (Sewanee) and the Wharton School of Business of the University of Pennsylvania. Burwell, 340 S.E.2d at 790.
 
 
 24
 Here, we find that the trial court properly allowed the jury to consider whether Wade Jones could be classified as ignorant and unwary. Jones, one of thirteen children born into impoverished circumstances, has not been blessed with intelligence, education, or business experience. As previously mentioned, expert testimony at trial established that Jones is "educably retarded," possessing an IQ of 72. Although he attended school up until the seventh grade, Jones is also functionally illiterate, reading at a second grade level. Defendant, though, suggests that Jones possesses prior business experience, because during his life he has purchased approximately ten to fifteen automobiles and one piece of land. As shown by evidence at trial, however, Jones, who does not know how to borrow money from a bank, had to have help in purchasing the land, and all of the cars were actually purchased by a farmer for whom Jones worked, with this farmer taking payments for the cars out of Jones' wages. In reply to this evidence, JWH suggests that because Jones had procured help in his prior business dealings, the court should have found him negligent as a matter of law here for not so doing. We find, though, that this was a consideration properly left to the jury in its determination of whether Jones' reliance was justifiable. The court properly allowed the jury to consider the fraud cause of action in this case, thus we uphold an award of punitive damages for Jones.
 
 III.
 
 25
 JWH also contests the amount of the punitive damage award, believing it excessive. Defendant's motion for a new trial on punitive damages was denied by the trial court, and under South Carolina law this decision must be upheld unless it is an abuse of discretion, with the award being "wholly unsupported by the evidence or so excessive as to be the result of caprice, passion or prejudice and ... so grossly excessive as to shock the conscience of the court." Durham v. Clements, 295 S.C. 90, 367 S.E.2d 174, 175 (Ct.App.1988).
 
 
 26
 When assessing a punitive damage award, a court "should consider the character of the tort committed, the punishment which should be given and the ability of the wrongdoer to pay." Id. at 175. Here, the facts of the case are rather appalling; three different departments of JWH, sales, construction, and mortgage, were involved in possible fraudulent conduct in their dealings with a retarded person. Likewise, as for the company's ability to pay, the trial court had evidence showing that JWH possessed 59 million dollars in assets, and the company is a subsidiary of Jim Walter Corporation, a multi-billion dollar corporation; although JWH has since been involved in proceedings in a federal bankruptcy court, this Court has been presented with no evidence showing that those proceedings should change this finding.
 
 
 27
 JWH appears troubled that the punitive damage award of $100,000 was over five times the amount of the actual damage award. Yet, as has been noted by a federal district court: "The South Carolina Supreme Court has repeatedly shown no great discomfort with punitive damage awards in the range of three to ten times the actual damage award and has, on occasion, approved awards much higher." Robertsen v. State Farm Mutual Automobile Ins. Co., 464 F.Supp. 876, 879 (D.S.C.1979). For cases similar to ours where the punitive damage award was over twenty times as great as the award for actual damages, see Weatherford, supra; Thompson v. Home Security Life Ins. Co., 271 S.C. 54, 244 S.E.2d 533 (1978); and Freeman v. A & M Mobile Home Sales, Inc., 293 S.C. 255, 359 S.E.2d 532 (Ct.App.1987). We thus find that the district court did not abuse its discretion when it upheld the jury's award of punitive damages in the amount of $100,000.
 
 
 28
 Accordingly, the disposition of the case below is
 
 
 29
 AFFIRMED.