Thomas H. WINGARD, Doc Brown, Heber Branham, George Giles, R.L. Newman, Michael J. Broom, and T. Frank Cone, Plaintiffs,

v.

EXXON CO., U.S.A., Defendant.

Civ. A. No. 3:90–2714–21.

United States District Court,
D. South Carolina,
Columbia Division.

Oct. 28, 1992.

Stephen Jahue Moore, West Columbia, SC, Dimitri G. "Jim" Daskal, Washington, DC, for plaintiffs.

James Covington Parham, Jr., Greenville, SC, Gaspare J. Bono and Gilbert S. Keteltas, Washington, DC, for defendant.

## AMENDED ORDER

TRAXLER, District Judge.

This matter is before me on the motion of the defendant ("Exxon") for summary judgment pursuant to Fed.R.Civ.P. 56.[1] I **grant** the motion as to all causes of action.

## I. SUMMARY JUDGMENT STANDARD

The standard for granting summary judgment is well known.

Fed.R.Civ.P. 56(c) states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue of such a material fact is "genuine" if the evidence so offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257, 106 S.Ct. at 2514. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *Unit-*

---

1. This court previously issued an Order on September 2, 1992, granting Exxon partial summary judgment. The court, after holding a hearing on Exxon's motion to reconsider the decision denying summary judgment, substitutes this Order for the one previously entered.

ed States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324, 106 S.Ct. at 2553. Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action which he bears the burden of adducing at a trial on the merits.

■ Summary judgment serves the useful purpose of disposing of meretricious, pretended claims before the court and the parties become entrenched in frivolous litigation. *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir.1987). Moreover, although summary judgment is a more extreme remedy, the courts should not be reluctant to grant summary judgment in appropriate cases; indeed, summary judgment is mandated where appropriate. *Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir.1989); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *United States v. Porter*, 581 F.2d 698, 703 (8th Cir. 1978); *Estate of Detwiler v. Offenbecher*, 728 F.Supp. 103, 134 (S.D.N.Y.1989); *Burleson v. Illinois Farmers Ins.*, 725 F.Supp. 1489, 1490 (S.D.Ind.1989). In a recent trilogy of decisions—*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89

L.Ed.2d 538 (1986)—the Supreme Court has consistently reaffirmed its endorsement of pretrial resolution and summary disposition of baseless actions. These decisions reflect the mandatory nature of Rule 56. In *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Court held:

> The Federal Rules of Civil Procedure have for almost 50 years authorized motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact. Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.' ... Rule 56 must be construed with due regard not only for the rights of person asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Id.* at 327, 106 S.Ct. at 2555 (citations omitted).

## II. FACTS

The facts of this case are not in dispute. The plaintiffs are seven dealers who operate Exxon service stations in the Columbia, S.C. area pursuant to franchise lease agreements with Exxon. The dealers have operated Exxon service stations for a number of years, varying from a low of nine, to a high of 38 years as Exxon dealers. Each dealer's current lease contains a provision which requires 24-hour, seven days a week operation ("24-hour provision").[2]

In 1988, Exxon established a uniform 24-hour operating program as part of its marketing strategy. Thereafter, a 24-hour operating requirement became a standard lease

---

2. Exxon has recently decided to sell its service stations in several states including South Carolina. As a result of this decision Exxon will not renew any of its current leases with South Carolina dealers. Additionally, as of September 1, 1992, Exxon no longer requires 24 hours operation of the dealers whose stations will be sold. (Watson Decl. dated 9/18/92, ¶¶ 2-3). Exxon's decision, however, does not affect the outcome of this case because the court must determine if there is sufficient evidence presented by the dealers that Exxon has committed any past offenses. Accordingly, this order will refer to the 24-hour provision as if it were still in effect.

provision for all Exxon service stations in the U.S.A. which had an average minimum traffic count exceeding 30,000 automobiles per day and nearby either: (1) a competing station open 24 hours; or (2) another 24–hour traffic generator.[3] It is uncontested that each of the dealers in this case meets Exxon's 24–hour operation criteria. Consequently, each dealer has the following provision in his lease:

> Lessee agrees ... to keep such station open for such purposes not less than *24:00* hours ... each day excepting *NONE,* which period the parties have agreed is reasonable considering customer convenience, competitive conditions and economic consequences to Lessee.

(Watson Ex. 2); (Defs.' Exs. 7, 22, 37, 50, 56, 73). Further, it is undisputed that each dealer was aware of, and understood, the 24–hour provision before he signed his current lease, and no dealer presently faces renewal or termination of his lease. Further, many of the dealers consulted with an attorney before signing the lease. (Wingard Dep. at 18); (Giles Dep. at 17); (Newman Dep. at 13–14).

### III. DEALERS' ALLEGATIONS

The dealers contend that they could not reject the 24–hour provision because it (the 24–hour provision) was offered, as was the remainder of the lease, on a "take it or leave it basis." (Pls.' Mem. Opp'n Def.'s Mot. Summ. J. at 2). As such, the dealers argue, the leases were non-negotiable contracts of adhesion. (Pls.' Compl. ¶ 4). They further allege that operating 24 hours a day, particularly during the hours of 12:00 a.m. to 6:00 a.m., imposes substantial hardships on the dealers. Such hardships include: (1) an increased risk of crime; (2) difficulty of obtaining reliable night shift employees; and (3) general unprofitability during the early morning hours. Additionally, the dealers argue that, unlike "c-stores",[4] the "relatively low volume, old, conventional service station[s]" they run are not suitable for 24–hour

---

**3.** Examples of 24–hour traffic generators include all-night restaurants, all-night supermarkets, factories, and motels. (Watson Decl. ¶ 4).

**4.** "C-stores" are characterized by the dealers as convenience stores which typically have 24 or

operation. (Pls.' Mem. Opp'n Def.'s Mot. Summ. J. at 5).

The dealers filed this action claiming that the 24–hour provision (1) is unconscionable; (2) violates the contractual obligations of good faith and fair dealing; and (3) violates South Carolina's Unfair Trade Practices Act ("UTPA"), S.C.Code Ann. § 39–5–10 *et seq.* (Law.Co-op.1976). Additionally, the dealers allege that the 24–hour provision violates South Carolina's blue laws by requiring the dealers to open before 1:30 p.m. on Sunday. S.C.Code Ann. § 53–1–5 *et seq.* (Law.Co-op. 1992).

Exxon, as an initial affirmative defense, asserts that the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 *et seq.* (1988) preempts the unconscionability and unfair trade practices claims, as well as the lack of good faith and fair dealing claim. Curiously, Exxon does not contend that the PMPA preempts the illegal Sunday operation claim. Exxon moves for summary judgment on its preemption defense, as well as to all causes of action. All of these motions will be dealt with in the following discussion.

### IV. DISCUSSION

#### A. *Preemption*

■ The PMPA contains an express preemption provision which prohibits a state from adopting or enforcing any law or regulation with respect to the termination or nonrenewal of any franchise agreement, unless such law or regulation is the same as the applicable provision of the PMPA:

> To the extent that any provision of this chapter applies to the **termination** ... of any franchise, or to the **nonrenewal** ... of any franchise relationship, *no State* or any political subdivision thereof *may adopt, enforce, or continue in effect any provision of any law or regulation ... with respect to* **termination** *... of any such franchise or to the* **nonrenewal** *... of any such*

---

more nozzles, pump high volumes of gasoline, generate substantial profits from the sale of ancillary products inside the store, and have state of the art security systems. (Pls.' Mem. Opp'n Def.'s Mot. Summ. J. at 4).

*franchise relationship* unless such provision of such law or regulation is the same as the applicable provision of this subchapter.

15 U.S.C. § 2806(a) (emphasis added). The plain meaning of the provision is to proscribe any state attempt to regulate the termination or nonrenewal of franchise agreements in a manner that is inconsistent with the PMPA.

Exxon contends that "[e]ven though plaintiffs have not been terminated or nonrenewed, the federal PMPA governs this case and preempts plaintiffs' state law claims." (Def's Mem. Supp. Mot. Summ. J. at 16). During a hearing on its motion for summary judgment, counsel for Exxon argued that to allow the dealers' state law claims to proceed abrogates one of the statutory grounds for nonrenewal of a franchise agreement, specifically § 2802(b)(3)(A).[5] Consequently, if the dealers' succeed in striking the 24–hour provision from their leases, Exxon alleges it will be subsequently stripped of its statutory right to refuse renewal of the leases because of a failure to agree upon a new 24–hour lease term. As such, the derivative result of the state claims is a possible conflict with the PMPA's preemption provision.

▉ Initially, the court notes that the presumption against federal preemption of state law is strong. Indeed, "this court should be reluctant to determine that state law has been preempted by federal legislation, since '[t]he exercise of federal supremacy is not lightly to be presumed.'" *Jimenez v. BP Oil*, 853 F.2d 268, 271 (4th Cir.1988), *cert. denied*, 490 U.S. 1011, 109 S.Ct. 1654, 104 L.Ed.2d 168 (1989), quoting *Tousley v. North Am. Van Lines*, 752 F.2d 96, 101 (4th Cir.1985). By its express language the PMPA's preemption provision is limited in scope to state laws or regulations affecting the termination and nonrenewal of franchise agreements. Exxon apparently asks this court to expand the scope of preemption to include the *threat of subsequent termination and nonrenewal*. Exxon argues that the dealers' claims are impliedly preempted by the PMPA because allowance of the claims may nullify other provisions of the PMPA, namely § 2802(b)(3)(A). This reasoning was recently rejected in *Cipollone v. Liggett Group, Inc.*, —— U.S. ——, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).

In *Cipollone*, the Court considered whether a federal statute,[6] or its predecessor, both of which required every cigarette package to contain a conspicuous warning of the hazards of smoking, preempted common law claims against cigarette manufacturers. Both federal statutes in question contained a specific preemption provision. The Court held that the preemptive scope of a federal statute is determined exclusively by examining the express language of the preemptive provision:

> In our opinion, the pre-emptive scope . . . is governed entirely by the express language in . . . each Act. When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a "reliable indicium of congressional intent with respect to state authority," . . . "there is no need to infer congressional intent to preempt state laws from the substantive provisions" of the legislation.

*Cipollone*, at ——, 112 S.Ct. at 2618 (citations omitted).

In this case, it is abundantly clear that the dealers' claims are not preempted by the PMPA. Focusing on the express language of § 2806(a) to ascertain the preemptive scope of the PMPA, the court concludes that the dealers' claims are not preempted because the claims do not involve the termination or nonrenewal of a franchise agreement. This court declines Exxon's invitation to engage in a speculative search throughout other substantive provisions of the PMPA to decide the preemption issue in this case: "Congress' enactment of a provision defining the pre-

---

**5.** Under § 2802(b)(3)(A), the parties' failure to agree to changes or additions in the franchise agreement is grounds for nonrenewal if: (1) such changes or additions were proposed in good faith and in the normal course of business; and (2) the proposed changes or additions are not insisted upon by the franchisor for the purpose of preventing renewal of the franchise agreement.

**6.** Public Health Cigarette Smoking Act of 1969, Pub L. No. 91–222, 84 Stat. 87 (1969) (current version at 15 U.S.C. § 1331 *et seq.* (1988)).

emptive reach of a statute implies the matters beyond that reach are not pre-empted." *Id.* Accordingly, the dealers' state law claims are not preempted by the PMPA.

## B. *The Merits of the Dealers' Claims*

### 1. Unconscionability claim.

 The dealers allege that the 24–hour provision in their leases is unconscionable and unenforceable. Whether a contract, or a provision of such contract, is unconscionable is a question of law. "Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Gordon v. Crown Cent. Petroleum Corp.,* 423 F.Supp. 58, 61 (N.D.Ga.1976), *aff'd,* 564 F.2d 413 (5th Cir.1977), quoting, *Williams v. Walker–Thomas Furniture Co.,* 350 F.2d 445, 449 (D.C.Cir.1965). Unconscionability is measured at the making of the contract, and the test is "whether the terms are so extreme as to appear unconscionable according to the mores and business practices of the time and place." *Williams,* at 450, quoting, 1 Arthur L. Corbin, *Contracts* § 128 (1963).

In *Gordon,* the plaintiff, a former service station dealer, alleged, as in this case, that a 24–hour operation provision was an unconscionable term of an adhesion contract. *Id.* at 60. The court, however, rejected both the unconscionability and adhesion contract claims. *Id.* at 62. In finding that the lease was not unconscionable, the court relied on the plaintiff's failure to show that the lease contained any of the following inequities: (1) exertion by one party of unusually strong bargaining power in formulating the lease; (2) failure on the part of the weaker party to read or understand the lease; or (3) formulation of an extreme lease when compared with similar leases in the business community:

> The plaintiff here makes the argument that generally oil companies exert an unusually strong bargaining power over their franchisees. The plaintiff fails, however, to make any showing that the defendant *exerted such power in formulating the agreement* with plaintiff, that plaintiff *failed to read or understand* the provisions of the Agreement, or that the provisions are in any way *extreme and not in accordance with the business practices in the community.*

*Gordon,* at 62 (emphasis added).

Applying the unconscionability factors mentioned in *Gordon,* this court finds that, as a matter of law, a 24–hour provision in a Columbia, S.C. service station lease is not "unconscionable." First, it is uncontested that Exxon's marketing criteria for 24–hour operation is uniformly applied throughout the nation; that a 24–hour provision is standard for leases of stations which meet the criteria (Watson Decl. ¶ 4); and all of the dealers meet Exxon's 24–hour operation criteria. (Watson Decl. ¶ 6). Accordingly, it does not follow that Exxon, in following its objective marketing criteria, used its "unusually strong bargaining power" to unilaterally impose upon these particular dealers a 24–hour operation provision. As such, the burden is upon the dealers to show how Exxon used its "unusually strong bargaining power" to formulate the leases, and they have failed to produce any evidence on this point. Second, there is no evidence that the dealers failed to read or understand the 24–hour provision. Instead, all the dealers admitted they understood the significance of the 24–hour provision and many received legal advice on the matter. (Wingard Dep. at 18; Brown Dep. at 22–24; Giles Dep. at 17; Newman Dep. at 13–14; Broom Dep. at 27, 37; Cone Dep. at 26–27). Finally, there is no evidence whatsoever that the 24–hour provision is not in accord with the business practices of the community. 24–hour service stations are commonplace in the Columbia area. In fact, there are approximately 100 service stations which operate 24–hours a day in the Columbia area. (Watson Decl. ¶ 5). The dealers have failed to show any basis for a finding of "unconscionability"; therefore, there is no genuine issue of material fact in dispute. Accordingly, this court **grants** the defendant's motion for summary judgment as to the claim the 24–hour provision is unconscionable.

### 2. Contract of adhesion claim.

 Closely related to the dealers' unconscionability claim is the allegation that the

leases are unenforceable contracts of adhesion. The court is unable to find any South Carolina case law defining a contract of adhesion. However, a contract of adhesion is generally thought of as a standard form contract offered on a "take-it-or-leave-it" basis. The terms of a contract of adhesion are not negotiable. An offeree faced with such a contract has two choices: complete adherence or outright rejection. E. Allen Farnsworth, *Contracts* § 4.26 at 295 (1982).

■ It is undisputed that the leases involved in this case were not offered on a strict "take-it-or-leave-it" basis. The record reveals, quite to the contrary, that Exxon was well aware of S.C.'s blue laws, and consequently was willing to waive enforcement of the 24–hour provision on Sunday for any dealer who opposed operating on Sunday. (Watson Decl. ¶ 16). In fact, when one of the dealers, Frank Cone, actually objected to operating 24 hours on Sunday, he received a waiver. (Cone Dep. at 34–38); (Def.'s Ex. 74).[7] Additionally, in his deposition Mr. Cone testified that he had discussions with all the dealers involved in this action, and all of them were aware of Exxon's willingness to waive 24 hour Sunday operation. (Cone Dep. at 41–44). Further, Thomas Wingard refused Exxon's offer to strike 24 hour Sunday operation from his lease. (Wingard Dep. at 21–22). Accordingly, the record fails to reveal that the dealers' leases were offered on a "take-it-or-leave-it" basis. As such, the leases are not true contracts of adhesion.

■ Assuming the leases are contracts of adhesion because they are standard form contracts, it does not necessarily follow that the 24–hour provision is unenforceable. The court is unaware of any South Carolina case discussing the enforceability of terms of a contract of adhesion. However, it is basic hornbook law that a party may avoid any term of a contract of adhesion if it can be shown that the parties did not mutually assent to the term. Lack of mutual assent arises when a party to a contract does not knowingly agree to all of the terms. This usually is the case when an unfair term is found in fine print, on the reverse side of the contract, or is otherwise undetectable. Even if there is mutual assent, contract terms may be avoided if they are unconscionable or against public policy. *See generally* John D. Calamari and Joseph M. Perillo, *Contracts* § 9–44 at 336–343 (2nd ed. 1977).

■ The dealers cannot argue that there was a lack of mutual assent. Each dealer initialed the 24–hour provision in his lease. All of them had ample time to review their lease; and, as reasonable businessmen, many received legal advice before signing their lease. There is no element of surprise or deception at work here. With mutual assent established, to strike the 24–hour provision the dealers must show that the provision is unconscionable or against public policy. As discussed above, the 24–hour provision is neither unconscionable nor against the public policy of South Carolina. As in *Gordon,* this court cannot conclude that the 24–hour provision is an unenforceable term of a contract of adhesion.

### 3. Breach of the contractual obligations of good faith and fair dealing claim.

The dealers contend that "Exxon's conduct, in unilaterally adopting and enforcing the 24 hour provision" violates the contractual obligations of good faith and fair dealing. (Pls.' Mem. Opp'n Def's Mot. Recons. at 8–9). The dealers, however, do not specify what conduct of Exxon gave rise to the breach of these implied covenants.[8]

■ A party to a contract does not violate the covenants of good faith and fair dealing by simply demanding that the other

---

**7.** Defendant's exhibit 74 is a letter to Frank Cone in which Exxon waived requiring Mr. Cone to operate 24 hours on Sunday. The letter reads in relevant part:

Dear Mr. Cone:

In response to your letter of July 20, 1988, … Exxon will waive specific hours requirements relative to Sunday operations if you feel that Sunday operations interfere with your Sunday worship activities.

**8.** Additionally, the dealers do not contend that allegedly forcing Sunday operations upon them violates the covenants of good faith and fair dealing. *See* (Pls.' Compl. ¶ 16); (Pls.' Mem. Opp'n Def.'s Mot. Summ. J. at 23–26); and (Pls.' Mem. Opp'n Def.'s Mot. Recons. at 8–9).

party to the contract perform as agreed upon: "There is no breach of an implied covenant of good faith where a party to a contract has done what the provisions of the contract expressly gave him the right to do." *First Federal Sav. & Loan Assoc. of S.C. v. Dangerfield,* 307 S.C. 260, 414 S.E.2d 590, 594 (S.C.Ct.App.1992); *Accord Automatic Sprinkler Corp. of America v. Anderson,* 243 Ga. 867, 257 S.E.2d 283, 284 (1979).

■ This court has already determined that the 24–hour provision is not unconscionable. Consequently, Exxon could not have breached the covenants of good faith and fair dealing by merely insisting that the dealers operate as contractually agreed upon—24 hours a day. The dealers, in effect, argue that Exxon "breached an implied duty by doing what the contract expressly permitted it to do." *Dangerfield,* at 594. Exxon's conduct, however, was in accordance with the terms agreed upon. Accordingly, the court **grants** Exxon's motion for summary judgment on the breach of the covenants of good faith and fair dealing claim.

### 4. Blue laws claim.

The dealers further allege that the 24–hour provision is unenforceable as it pertains to Sunday operation because it forces them to open before 1:30 p.m. on Sunday.[9] As such, the dealers contend, it is an "illegal contract provision," and "void as against the public policy of South Carolina." (Pls.' Mem. Opp'n Def.'s Mot. Recons. at 9).

Initially, the court notes that operation of a service station before 1:30 p.m. is not a *per se* violation of S.C.'s blue laws. Although the blue laws prohibit all work on Sunday except for work of necessity or charity, *See* S.C.Code Ann. § 53–1–40 (Law Co-op.1992), the prohibition on work does not apply after 1:30 p.m. on Sunday. S.C.Code Ann. § 53–1–5 (Law Co-op.1992). Further, not all work conducted before 1:30 p.m. on Sunday is prohibited. S.C.Code Ann. § 53–1–50 (Law Co-

op.1992) contains a list of exceptions to § 53–1–40. The exceptions to the prohibition on Sunday work include:

(1) The sale of food needs, ice, or soft drinks.

(2) The sale of tobacco and related products.

(5) The ... sale or delivery of ... motor fuels, oils, or gases, or the purchase or installation of repair parts or accessories for immediate use in cases of emergency in connection with motor vehicles, ... nor to the cleaning of motor vehicles.

Section 53–1–50. Accordingly, operating a service station falls within the exceptions to the blue laws. Therefore, the 24–hour provision, as it relates to Sunday operation, is neither illegal nor against the public policy of South Carolina.

■ This is not the end of the blues laws inquiry because the dealers allege that Exxon forced them to operate on Sunday. Under the blue laws:

No proprietor of a retail establishment who is *opposed to working on Sunday* may be *forced by his lessor or franchisor to open his establishment on Sunday* nor may there be discrimination against persons whose regular day of worship is Saturday.

Section 53–1–5 (emphasis added). Thus, in this case a § 53–1–5 violation requires a showing of two elements: (1) the dealers oppose working on Sunday; and (2) Exxon forced the dealers to work on Sunday. The undisputed facts indicate that the dealers cannot show either element. First, at an October 9, 1992, hearing on this motion, dealers' counsel admitted that the dealers do not oppose working on Sunday. Instead they oppose being forced to operate during unprofitable hours. The admission made by dealers' counsel is fully supported by the deposition testimony of each of the dealers. Particularly enlightening on this point is the testimony of George Giles:

---

**9.** Actually the dealers asked the court to declare "that the Sunday hours provision in their leases is illegal and in violation of South Carolina law." (Pls.' Compl. ¶ 9). The leases, however, do not contain a "Sunday hours" provision. Instead, the leases contain a 24–hour, seven days a week,

operation provision. At an August 25, 1992, hearing on Exxon's motion for summary judgment, dealers' counsel stated that it was their position that in requiring operation before 1:30 p.m. on Sunday, the 24–hour provision violates the blue laws.

Q. Mr. Giles, you filed a lawsuit ... So, Mr. Giles, you're not complaining about Sunday operations?

A. No, sir, I haven't complained about Sunday operations.

Q. And you're not in this lawsuit complaining about Sunday operations?

A. I don't think that was what it was drawn up for, was Sunday operations, anything in it. I don't, I mean maybe I missed something.

* * *

Q. Mr. Giles, is that one of your issues?

A. Sunday operations is not one of my issues, no, sir.

(Giles Dep. at 25). *See also* (Wingard Dep. at 21–22); (Brown Dep. at 24, 28–29); (Newman Dep. at 26–28); (Broom Dep. at 37); (Cone Dep. at 37–38). Thus, it is undisputed that the dealers are not opposed to working on Sunday. As such, there can be no violation of § 53–1–5.

Assuming that the dealers did oppose working on Sunday, their blue laws claim still fails because the dealers cannot show that Exxon forced them to work on Sunday. As discussed above, Exxon was aware of S.C.'s blue laws, and did not require Sunday operation from any dealer who opposed working on Sunday. *See* (Cone Dep. at 37–38 & 41–44); (Wingard Dep. at 21–22); (Watson Decl. ¶ 16); (Def.'s Ex. 74). Accordingly, the court **grants** the motion of Exxon for summary judgment as to the blue laws claim.

**5. UTPA claim.**

■ The dealers also allege that the 24–hour provision violates the UTPA. The UTPA simply, but broadly, declares that: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." S.C.Code Ann. § 39–5–20(a) (Law Co-op.1976). Exxon contends that the UTPA claims are not actionable because the alleged unfair trade practices do not affect the public interest. *Columbia E. Assocs. v. Bi-Lo, Inc.,* 299 S.C. 515, 386 S.E.2d 259 (S.C.Ct.App.1989). However, South Carolina's Supreme Court has stated that: "[a]n unfair or deceptive trade practice has an

impact upon the public interest if it has the potential for repetition." *Haley Nursery Co. v. Forrest,* 298 S.C. 520, 381 S.E.2d 906, 908 (S.C.1989). In this case, the potential for repetition is no longer present in the sense that the dealers' leases will not be renewed, and Exxon has decided to sell its S.C. service stations. But the "potential for repetition" is not disposed of by simply abandoning the particular practice which is alleged to be unfair or deceptive. Exxon's business decision to sell its S.C. service stations may eliminate the potential for repetition in the sense that Exxon no longer will be entering into lease agreements with S.C. dealers. It does not, however, eliminate the possibility that there were past violations of the UTPA which had the potential for repetition. Therefore, for purposes of the UTPA, the "potential for repetition" remains. To survive summary judgment, however, the dealers must produce some evidence that the "potential for repetition" of a UTPA violation remains.

The UTPA prohibits: (1) unfair methods of competition; (2) unfair acts or practices; and (3) deceptive acts or practices. In this case there are no allegations of any deceptive acts or practices, and the undisputed facts would not support such allegations. Each dealer was well aware of the 24–hour provision before he signed his lease. Further, the dealers do not contend that 24–hour operation is an unfair method of competition. Indeed, given the large number of 24–hour service stations in the Columbia, S.C. area, it is fair to say that such stations are the rule, rather than the exception. By process of elimination this leaves the dealers with one ground to base their UTPA claim on: unfair act or practice.

■ Under the UTPA, "[a] trade practice is 'unfair' when it is offensive to the public policy or when it is immoral, unethical, or oppressive;" *Young v. Century Lincoln-Mercury,* 302 S.C. 320, 396 S.E.2d 105, 108 (S.C.Ct.App.1989), *aff'd. in part & rev'd. in part,* —— S.C. ——, 422 S.E.2d 103 (S.C. 1992). As discussed above, the court has concluded that a 24–hour provision in a service station lease is not against the public policy of S.C. The dealers have failed to

make any showing whatsoever that the 24–hour provision is "immoral, unethical, or oppressive." In fact, the court is unaware of how a 24–hour provision in a lease of a service station located in a city of approximately 100,000 could ever be considered immoral or unethical. Definitions of "oppressive" include "unreasonably burdensome or severe" and "tyrannical." *Webster's Ninth New Collegiate Dictionary*, 828 (1986). Under these definitions, the alleged problems generated by the 24–hour provision cannot reasonably be considered "oppressive". The court has already determined that the 24–hour provision is neither unconscionable, nor an unenforceable term of a contract of adhesion. The dealers have failed to produce any evidence of an unfair trade practice; accordingly, they have failed to allege a UTPA violation:

> The fact that the defendants in this case could repeat their acts, none of which may be inferred to have violated the applicable laws, cannot be deemed to have affected the public interest *unless* they are first adjudged unfair or deceptive trade practices. The potential for repetition is only used to satisfy the public interest component necessary to bring an unfair trade practice within the scope of the UTPA. Otherwise, any act, regardless of its blatant legality, would become an unfair trade practice merely by its capability to be repeated. Such is not, and could not be, the import of the UTPA or *Noack* [*Enterprises, Inc. v. Country Corner Interiors, Inc.*, 290 S.C. 475, 351 S.E.2d 347 (Ct.App. 1986) ].

*Blanton Enterprises v. Burger King*, 680 F.Supp. 753, 768 n. 14 (D.S.C.1988).

▉ Additionally, an unfair or deceptive trade practice cannot be inferred from the conduct of Exxon. Generally, an unfair trade practice involves a misrepresentation made to a consumer. *See Goiser v. Harper*, 307 S.C. 64, 413 S.E.2d 845 (S.C.Ct.App.1991) (defrauded investors); *Dowd v. Imperial Chrysler–Plymouth*, 298 S.C. 439, 381 S.E.2d 212, 214 (S.C.Ct.App.1989) (untruthful car salesman); *Barnes v. Jones Chevrolet*, 292 S.C. 607, 358 S.E.2d 156, 159 (S.C.Ct.App. 1987) (padding auto repair bills). In this case there is no element of misrepresentation. Each dealer entered into his current lease as an experienced businessman with full knowledge of all material terms. The dealers now simply allege that the 24–hour provision violates the UTPA, but they fail to explain how an unfair trade practice can be inferred from the execution of a perfectly valid contract. Even if the 24–hour provision is unfair in the sense that it is somewhat harsh, "[t]he SCUTPA does not prohibit all business activities that someone may consider 'unfair', however." *Miller v. W.H. Bristow, Inc.*, 739 F.Supp. 1044, 1055 (D.S.C. 1990). As such, the 24–hour operation provision cannot be said to be "unfair" as that term is used in the UTPA. Accordingly, the court **grants** the motion of Exxon for summary judgment as to the UTPA claim.

### IV. CONCLUSION

The dealers' state laws claims are not preempted by the PMPA because the claims do not involve the termination or nonrenewal of a franchise agreement. As such, the claims are beyond the preemptive scope of the PMPA. The 24–hour operation provision is not unconscionable, as it does not offend the mores and business practices of service stations in the Columbia, S.C. area. Nor is the 24–hour provision an unenforceable term of a contract of adhesion, since it was not offered on a strictly "take-it-or-leave-it" basis. Further, Exxon cannot violate the covenants of good faith and fair dealing by merely insisting that the dealers operate as contractually agreed upon. The undisputed facts show that no dealer opposes working on Sunday, and Exxon has not forced Sunday operation upon any dealer. Accordingly, there is no blue laws violation. Finally, the dealers have failed to show an unfair or deceptive act, or an unfair method of competition. As such, the dealers' have failed to show an evidentiary basis for a UTPA claim. **THEREFORE, IT IS ORDERED** that the defendant's motion for reconsideration and entry of summary judgment as to all causes of action is **granted.**

**IT IS SO ORDERED.**