22470

Lewis C. BURWELL, Jr., Respondent v. The SOUTH CAROLINA NATIONAL BANK, Appellant.

(340 S. E. (2d) 786)

Supreme Court

</div>

---

*Jesse C. Belcher, Jr.,* and *O. G. Calhoun, Haynsworth, Perry, Bryant, Marion & Johnstone,* Greenville, *for respondent.*

*L. Henry McKellar* and *Manton M. Grier,* Columbia, *for appellant.*

Heard Oct. 7, 1985.

Decided Feb. 11, 1986.

FINNEY, Justice:

The respondent, Lewis C. Burwell, Jr., commenced this action against the appellant, South Carolina National Bank (SCN), seeking actual and punitive damages on the grounds that SCN fraudulently induced him to sign documents guaranteeing a loan from SCN to Pinehurst Airlines, Inc.,

(Pinehurst). Mr. Burwell also alleged that SCN breached its fiduciary duty to him by allowing Pinehurst's loan to be renewed without his knowledge.

SCN appeals the general verdict in favor of Mr. Burwell for two hundred thirty-nine thousand seven hundred sixty and 94/100 ($239,760.94) dollars actual damages and two hundred fifty thousand and no/100 ($250,000.00) dollars punitive damages alleging that the trial judge erred in failing to grant its motion for a directed verdict, judgment n.o.v. or for a new trial. SCN contends Mr. Burwell failed to prove actionable fraud or to prevent evidence as to the existence of a fiduciary relationship between SCN and Mr. Burwell for the purposes of this transaction. We agree and reverse.

Lewis C. Burwell, Jr., was the founder of Pinehurst Airlines, Inc., Chairman of the Board and Executive Director until 1980. At that time, he sold his controlling interest in the corporation to J. W. Bailey. His family retained their shares, and Mr. Burwell remained actively involved in the operation of the company. He maintained an office in the Pinehurst building and he also attempted to help arrange a public offering of the corporation's stock after the business began to experience financial difficulties. After Pinehurst's problems began, Mr. Burwell, at Mr. Bailey's request, agreed to guarantee a series of loans from SCN to Pinehurst to keep the operation running. Several of the loans Mr. Burwell guaranteed were successfully repaid by Pinehurst, but when the corporation went bankrupt in January of 1982, Mr. Burwell lost a large amount of money on one loan he had guaranteed. This action resulted.

From August to October, 1981, Burwell signed the following five documents to guarantee three of Pinehurst's loans:

1. Three loan guarantees each entitled, "Continuing Guaranty Of Payment," dated August 28, 1981, September 24, 1981, and September 29, 1981, for one hundred fifty thousand ($150,000.00) dollars, three hundred thousand ($300,000.00) dollars, and four hundred thousand ($400,000.00) dollars, respectively;

2. One Assignment of Safekeeping Account dated September 24, 1981, by which he assigned his SCN safekeeping account as collateral; and

3. One Third Party Collateral Assignment Agreement dated October 1, 1981, by which he again assigned his safekeeping account as collateral.

Before he signed the Third Party Collateral Assignment Agreement, Mr. Burwell noticed that it contained language related to renewals of successive transactions with which he did not agree. According to his testimony, he struck out the objectionable language by hand, then telephoned H. Reid Sherard at SCN and received his assurance that the changes were acceptable. Mr. Sherard subsequently initiated the changes made by Mr. Burwell. The following paragraph was also added to the document by typewriter:

> This assignment and the assignment executed by the assignor on September 24, 1981 taken together are limited to secure the indebtedness of Pinehurst Airlines, Inc. in the amount of three hundred thousand dollars ($300,000.00).

On November 4, 1981, Pinehurst's three notes were paid out of the proceeds from the sale of one of the company's airplanes, and the five documents connected with these loans were cancelled.

On November 16, 1981, J. W. Bailey again contacted Mr. Burwell and asked him to guarantee the repayment of a one hundred seventy-five thousand ($175,000.00) dollar short term loan to the corporation. This loan was to be repaid out of additional escrow funds from the sale of the plane. Mr. Burwell was at home recovering from a heart condition when he was contacted by Mr. Bailey, but he agreed to guarantee the additional loan.

The following day, Mr. Burwell was taken to the office of Mr. Sherard at SCN where he carried on a detailed discussion with Mr. Sherard concerning his guaranteeing the Pinehurst loan. At the close of the meeting on November 17, 1981, Mr. Burwell executed the following documents.

1. Loan guarantee entitled "Continuing Guaranty Of Payment," in the amount of two hundred twenty-five thousand ($225,000.00) dollars, which is identical to the loan guarantees he signed previously. (Mr. Burwell does not contest the fact that he agreed to guarantee the loan in this amount).

2. Assignment Of Safekeeping Account; and
3. Third Party Collateral Assignment Agreement.

Mr. Burwell testified that he was physically able to read, but in fact did not read the documents; he merely looked over them. He also failed to check whether the language about renewals, which he had previously deleted, had been included in this document. Before he signed the forms, Mr. Burwell did ask Mr. Sherard if these were the same documents he had previously signed. Mr. Sherard replied in the affirmative, but testified at trial that at the time he replied, he did not remember the handwritten modifications Burwell made to the previous document. Mr. Burwell also testified that the parties agreed that this fourth loan was to be repaid from the remains of the proceeds of the sale of the plane. These proceeds were still in escrow in Chicago and due to arrive in South Carolina around mid December, 1981. This agreement was not reflected in any of the contract documents.

Mr. Burwell testified that at the time he executed the loan documents, he remembered that he had stricken language he objected to in the Third Party Collateral Assignment Agreement dated October 1, 1981, but did not check to see if these three documents contained similar language. The Continuing Guaranty Of Payment signed November 17, 1981, provided as follows:

> ... The undersigned (whose obligations and liability hereunder shall be joint and several if more than one) hereby absolutely and unconditionally guarantees to the bank the prompt and full payment when due, whether by acceleration or otherwise, of any and all existing and future indebtedness and liability of every kind, nature and character of the Debtor to the Bank, however and whenever incurred or evidenced, whether direct or indirect, absolute or contingent, joint or several, *(including all renewals, extensions and modifications thereof)* together with all interest thereon ... (Emphasis added).

The Third Party Collateral Assignment Agreement and the Assignment Of Safekeeping Account also contained language which provided for renewal or extension of the under-

lying indebtedness in successive transactions *without* notice to the guarantor. *(Emphasis added).*

Repayment of SCN's loan to Pinehurst was due on December 17, 1981. Prior to that time, Carl Earl from Pinehurst contacted Mr. Sherard to determine if SCN could extend the loan without disturbing Mr. Burwell, who was recovering from heart by-pass surgery. Mr. Sherard agreed to an extension, on the same terms of the November 17, 1981, guaranty agreement, for a term of forty-six days without contacting Mr. Burwell. The proceeds from the sale of the plane arrived in South Carolina several days later, but were used by Pinehurst for other expenses.

At the beginning of January, 1982, when Mr. Burwell discovered that the loan had been renewed, he demanded that his collateral be returned. SCN refused.

Pinehurst filed for bankruptcy under Chapter 11 on January 26, 1982, and SCN immediately demanded payment of the principal and interest due on the two hundred twenty-five thousand ($225,000.00) dollar loan. On May 7, 1982, SCN sold the treasury bills in Mr. Burwell's safekeeping account, paid off the principal and interest due on the loan, and returned the balance to him.

On the first cause of action for fraud, SCN excepts to the trial judge's denial of its motion for a directed verdict, a judgment n.o.v. and a new trial. It is SCN's contention that the only reasonable inference to be drawn from the evidence is that Mr. Burwell consciously disregarded his duty to read the loan guaranty documents before he signed them and is, therefore, prohibited from asserting that SCN fraudulently misrepresented their contents. SCN also asserts that Mr. Burwell is clearly an experienced businessman, and he is not entitled to be released from his duty to read the contract by being characterized as ignorant and unwary.

As early as 1924, this Court recognized that every contracting party owes a duty to the other party to the contract and to the public to learn the contents of a document before he signs it. *J. B. Colt Co. v. Britt*, 129 S. C. 226, 123 S. E. 845 (1924). One cannot complain of fraud and misrepresentation in the contents of a document if the truth could have been ascertained by reading it. *Reid v. George*

*Washington Life Ins. Co.*, 234 S. C. 599, 109 S. E. 577 (1959). This rule is subject to the exception that if the party is ignorant and unwary, his failure to read the document may be excused. *Thomas v. American Workman*, 197 S. C. 178, 14 S. E. (2d) 886, 136 A.L.R. 1, (1941). This exception is, however, very strictly interpreted by our Court. In determining whether a party can be classified as ignorant and unwary, an individual's education, business experience and intelligence are all considerd. In *Doub v. Weatherly-Breeland Insurance Agency*, 268 S. C. 319, 233 S. E. (2d) 111 (1977), the Court found that an individual with a high school education and fifteen years experience operating his own business was not excused from his duty to read the contents of an insurance policy he signed.

Mr. Burwell is a graduate of The University of the South at Sewanee and Warton School of Business at the University of Pennsylvania. Since 1946 he has been involved with various airlines and has held directorship positions with companies both in the United States and abroad. He also testified that he had guaranteed numerous loans in the past and that this type of transaction was not new to him. Although he testified that he was not feeling well on November 17, 1981, when the loan guarantees were executed, Mr. Burwell negotiated with Mr. Sherard over the use of his collateral and obviously understood the purpose of the transaction. Clearly Mr. Burwell cannot be characterized as someone who is ignorant and unwary.

Mr. Burwell indicated he remembered he had modified the previous document, yet he made no effort to ascertain if the documents he was about to sign contained similarly objectionable language. Clearly he had a duty to read the loan guaranty documents before signing them. His failure to do so is inexplicable.

The normal bank-depositor arrangement creates a creditor-debtor relationship rather than a fiduciary one. *National Loan And Exchange Bank v. New York Life Insurance Company*, 149 S. C. 378, 147 S. E. 322 (1929). In limited circumstances, not found in this case, a fiduciary relationship may be created between a bank and a customer if the bank undertakes to advise the customer as a part of the services the bank offers. Such a relationship charges the

bank with a duty to disclose material facts which may affect its customers' interest.

The term fiduciary implies that one party is in a superior position to the other and that such a position enables him to exercise influence over one who reposes special trust and confidence in him. 36A C.J.S. *Fiduciary* (1961). As a general rule, mere respect for another's judgment or trust in his character is usually not sufficient to establish such a relationship. The facts and circumstances must indicate that the one reposing the trust has foundation for his belief that the one giving advice or presenting arguments is acting not in his own behalf, but in the interests of the other party. 36A C.J.S. *Fiduciary* (1961).

In the present case, no fiduciary relationship exists between Mr. Burwell and SCN for the purpose of this transaction. Mr. Burwell's status as a depositor at SCN during the period of the negotiation of the loan guarantees for Pinehurst is insufficient to create a fiduciary relationship with the bank. If Mr. Burwell reposed a special trust in Mr. Sherard, there is no evidence that Mr. Sherard was aware of it. Each party was cognizant of the tenuous financial position of the company on November 17, 1981, when the documents were signed. The fact that Mr. Burwell bargained with Mr. Sherard before he signed the documents indicates that Mr. Burwell was aware that the parties were dealing at arms length. He could not reasonably have believed that Mr. Sherard was acting on his behalf instead of on behalf of SCN.

The decisions of the trial court is hereby reversed.

In review of this Court's decision, the appellant's remaining exceptions need not be addressed.

Reversed.

GREGORY, HARWELL, and CHANDLER, JJ., concur.

NESS, C. J., not participating.