**Voncille McLEOD, Plaintiff,**

v.

**The HOME INSURANCE COMPANY, Defendant.**

**Civ. A. No. 87–0989–3.**

United States District Court, D. South Carolina, Anderson Division.

Oct. 1, 1987.

Samuel F. Albergotti, Anderson, S.C., for plaintiff.

William M. Grant, Jr., Edwin B. Parkinson, Jr., Haynsworth, Marion, McKay & Guerard, Greenville, S.C., for defendant.

### ORDER

GEORGE ROSS ANDERSON, Jr., District Judge.

This is a declaratory judgment action involving an automobile insurance policy issued by the Defendant to the Plaintiff and her husband. The Plaintiff alleged that the Defendant did not make a proper offer of underinsured motorist coverage to her in connection with the issuance of the policy so that she should be afforded underinsured motorist coverage by operation of law. The Defendant alleged that a proper offer was made to and rejected by Plaintiff's husband, who was a named insured of the policy and who was acting as

Plaintiff's agent. By agreement of the parties, the case was tried non-jury on August 27, 1987. For the reasons set forth below, the Court finds that there was an offer and a rejection of underinsured motorist coverage and the Plaintiff is not entitled to such coverage, either under the terms of the policy or by operation of law.

## FACTS

The Plaintiff and her husband, Stephen O. McLeod lived in Anderson, South Carolina. The Plaintiff was a housewife and her husband was Plant Manager of an aluminum plant in Belton, South Carolina. The Plaintiff was a high school graduate with some college education and her husband was manager of all operations at the aluminum plant, being responsible for more than one hundred employees. Both the Plaintiff and her husband agreed that Mr. McLeod took responsibility for the majority of the business decisions in the household and he assumed and maintained responsibility for procuring automobile insurance coverage for the household.

In the spring of 1984, Mr. McLeod approached the R.B. Keys Insurance Agency, Inc., in Belton for the purpose of placing his automobile insurance coverage through that agency. Mr. McLeod told the representatives of the agency that he wanted the same types and limits of coverage he had on his existing policy obtained through another agency. On that policy, he carried liability limits of $50,000/$100,000/$25,000 and uninsured motorist coverage of $15,000/$30,000/$5,000. There was no underinsured motorist coverage carried on that existing policy. The Keys Agency quoted a premium rate to Mr. McLeod to place such coverage with the Defendant Home Insurance Company and he agreed.

On April 18, 1984, Mr. McLeod signed an application for this coverage with the same limits as stated above. He also signed a form entitled South Carolina Uninsured/Underinsured Motorist Coverage Selection Form. Although Mr. McLeod could not recall reading or signing the form and could not recall any explanation of underinsured motorist coverage given to him, he acknowledged that it was his signature on this form on the line for the named insured's signature. Marshall Keys, one of the agents at the Keys agency, testified that he explained underinsured motorist coverage to Mr. McLeod before obtaining his signature on this form and that he witnessed Mr. McLeod signing the form. There are two lines on the form where both spouses can sign as named insureds and the Plaintiff did not sign the form, but Marshall Keys and Rufus Keys, another representative of the agency, both testified that it is standard practice for an insurance agency to obtain only one signature when one person is acting on behalf of the entire family.

Marshall Keys testified that he could not recall verbatim the coversation he had with Mr. McLeod in explaining underinsured motorist coverage to him. He did testify that he explained underinsured motorist coverage to Mr. McLeod and did not have him sign the form without such an explanation. According to Marshall Keys, he would have explained in general terms that underinsured motorist coverage would pay for the insured's damages if the at-fault motorist did not have liability limits sufficient to cover the damages.

The form itself was introduced as Defendant's Exhibit 1. At the top of the form, the signer is directed to read all options before making his selections. Beneath that, there is introductory language acknowledging that South Carolina law requires that each policy contain uninsured motorist coverage of $15,000/$30,000/$5,000. It also advises that increased levels of uninsured motorist coverage and underinsured motorist coverage must be offered.

The form also includes separate sections on increased uninsured motorist coverage and underinsured motorist coverage. In those sections, the applicant is given the option of accepting or rejecting such coverages. The choice is made by marking a box in each instance. If the applicant decides to purchase either or both of the coverages, he is directed to go further down the form and mark the limits of such optional coverage he desires. If the rejec-

tion boxes are marked, the accompanying language indicates a rejection of the offer to purchase such coverage and advises that "such insurance shall not be added to my policy or renewals thereof."

On the form dated April 18, 1984, which was signed by Mr. McLeod, both rejection boxes are marked. This is consistent with the application signed by Mr. McLeod on that date and the policy as issued, which provided uninsured motorist coverage of $15,000/$30,000/$5,000 and did not provide underinsured motorist coverage. The policy was issued with the Plaintiff and her husband listed as named insureds.

This policy continued in force and effect through the summer of 1985 but was cancelled by the Defendant for non-payment of premium on September 10, 1985. The McLeod family was, therefore, without automobile insurance coverage as of that date.

On September 16, 1985, the Keys Agency mailed out an automobile insurance newsletter to all of its insurance customers shown on a client list, which would have included the McLeods. That newsletter was written by the Keys for the purpose of informing their customers of various automobile insurance matters they thought were important. Contained in that newsletter were separate paragraphs containing discussions of liability, uninsured, and underinsured motorist coverage. As to liability and uninsured motorist coverage, the newsletter recommended the customer consider increasing his limits. As to underinsured motorist coverage, the newsletter recommended that each customer consider adding underinsured motorist coverage to his policy. That newsletter was introduced into evidence as Defendant's Exhibit 5. Mr. and Mrs. McLeod admitted that the address listed for them was proper and they admitted receiving premium notices and other mailings, but denied receiving this newsletter.

Four days later, on September 20, 1985, there was a telephone conversation between Mr. McLeod and Rufus Keys regarding the McLeods' automobile insurance situation. According to Mr. McLeod, he was not aware that the previous policy had been cancelled for non-payment and the purpose of his call to the Keys agency was to have them delete one automobile and increase the uninsured motorist coverage to $50,-000/$100,000/$25,000 so as to give him additional coverage for a new car if it was damaged by an uninsured motorist.

Rufus Keys agreed that he discussed with Mr. McLeod a deletion of a vehicle and an increase in the uninsured motorist coverage limits. He also testified that they discussed adding underinsured motorist coverage at those same limits and he advised Mr. McLeod that the underinsured motorist coverage would cost approximately $25.00 for two cars for six months. According to Rufus Keys, Mr. McLeod declined to purchase underinsured motorist coverage.

Mr. Keys produced a handwritten note of the telephone conversation which was introduced into evidence as Defendant's Exhibit 3. That note, which is dated September 20th, contains references to deletion of a 1983 Buick, changing the uninsured motorist limits and adding underinsured motorist coverage for $25.00, with the latter reference stricken through by the writer. Mr. Keys testified that this telephone note was made during the course of their telephone conversation and was thereafter placed in the McLeods' file.

Mr. Keys also presented a rate sheet from the Defendant Home Insurance Company, setting forth new premium charges for underinsured motorist coverage as of September 15, 1985. That rate sheet was introduced into evidence as Defendant's Exhibit 7. It appears from that rate sheet that Rufus Keys accurately quoted the premium charge for underinsured motorist coverage.

Because the previous policy had been cancelled for non-payment of premium and because the applicable grace period had elapsed, it was not possible to reinstate that policy and a new policy had to be issued for the McLeods. On September 25, 1985, Mr. McLeod signed an application for the new policy to be issued by the Defendant, listing the Plaintiff and Mr. McLeod as

named insureds. On that same date, Mr. McLeod also signed another selection form dealing with uninsured and underinsured motorist coverage, which was identical in form and language to the one he signed on April 18, 1984. The actual selections made on that form differed, however, from the previous form in that boxes were marked accepting increased uninsured motorist coverage at limits of $50,000/$100,000/$25,000. The rejection box for underinsured motorist coverage was marked in the same manner as on the previous form.

Mr. McLeod again acknowledged that it was his signature on the form, but could not recall signing or reading the form and could not recall any explanation of underinsured motorist coverage being given to him. The signature of Marshall Keys appears on this document, which was introduced into evidence as Defendant's Exhibit 4. According to Marshall Keys, he did witness Mr. McLeod signing that document. Marshall Keys did not, at that time, give another full explanation of underinsured motorist coverage, since both he and Rufus Keys had discussed this in the past with Mr. McLeod. He did, however, inquire once again as to Mr. McLeod's desires before having him sign this form. He stated that Mr. McLeod declined to purchase such coverage. The policy was, therefore, issued without underinsured motorist coverage on September 25, 1987, listing both the Plaintiff and her husband as named insureds.

The Plaintiff testified that her husband handled all the dealings with the Keys agency regarding the automobile insurance policy with the Defendant. She stated that it was her husband's responsibility to procure the insurance but that they usually discussed it before he acted. He did not ever discuss underinsured motorist coverage with her and she stated that she did not know of the availability of such coverage until after she was involved in an accident on May 2, 1986, while the policy was in force and effect.

That accident occurred in North Carolina and allegedly resulted in injuries to the Plaintiff. The Plaintiff has filed a tort action against the other driver, Robert L. Crawford, in the Court of Common Pleas for Spartanburg County. Mr. Crawford was insured by Allstate Insurance Company with stated liability limits of $15,000/$30,000/$5,000. That tort case has not yet been called for trial in Spartanburg County at the time this declaratory judgment action was tried.

## CONCLUSIONS OF LAW

■ The Court finds that Mr. McLeod was acting as agent for his wife, the Plaintiff, at all times relevant hereto. A principal is effected with constructive knowledge of all material facts of which the agent receives notice while acting within the scope of his authority. *Crystal Ice Company of Columbia, Inc. v. First Colonial Corporation*, 273 S.C. 306, 257 S.E.2d 496 (1979). When a principal clothes an agent with apparent authority to act in a certain capacity, she is bound by all acts of such agent within the scope of such authority. *Moore v. Pilot Life Insurance Company*, 205 S.C. 474, 32 S.E.2d 757 (1945). A principal is bound by the acts of the agent, acting within the scope of his authority, and notice to the agent under such circumstances is imputed to the principal. *Palmer v. Sovereign Camp, W.O.W.*, 197 S.C. 379, 15 S.E.2d 655 (1941). Consequently, the Court finds that the Plaintiff is bound by the knowledge and actions of her husband, Mr. McLeod.

■ Generally, one has a duty to read a written instrument and inform himself of its contents before signing it. One cannot complain about the contents of a written instrument if the truth could be ascertained by reading it, except where the party is "ignorant and unwary." This exception is strongly interpreted by the courts. In considering whether a party is ignorant and unwary, his education, business experience and intelligence are all to be considered. *Burwell v. South Carolina National Bank*, 288 S.C. 34, 340 S.E.2d 786 (1986); *Doub v. Weathersby–Breeland Insurance Agency*, 268 S.C. 319, 233 S.E.2d 111 (1977). The Court finds that Mr. McLeod was neither ignorant nor unwary and was

capable of understanding the import of the coverage selection forms he signed on two separate occasions. Both of those selection forms evidenced a rejection of underinsured motorist coverage for both policies and any renewals of those policies.

■ Underinsured motorist coverage must be offered to the insured in amounts up to the liability limits and a failure to make a meaningful offer results in the insured being entitled to underinsured motorist coverage by operation of law. *State Farm Mutual Automobile Insurance Company v. Wannamaker,* 354 S.E.2d 555 (S.C.1987). The insured must be provided with adequate information, and in such a manner, as to allow the insured to make an intelligent decision whether to accept or reject coverage. The Court finds that the Defendant did comply with the standards and requirements as set forth in *Wannamaker, supra,* and that Mr. McLeod was allowed the opportunity to make an intelligent decision whether to accept or reject underinsured motorist coverage. Mr. McLeod exercised his option and rejected such coverage and, as noted above, his rejection is binding on the Plaintiff.

In light of the foregoing, it is the conclusion of the Court that the Defendant made a proper offer of underinsured motorist coverage and that the option to purchase such coverage was rejected by the Plaintiff's husband, acting as her agent, so that both the offer and the rejection are binding on the Plaintiff. Consequently, there is no underinsured motorist coverage afforded by the Defendant to the Plaintiff for the accident of May 2, 1986.

AND IT IS SO ORDERED.