Lorraine **WILLIAMS–GARRETT,**
Plaintiff,

v.

Lynn **MURPHY, individually and d/b/a Centurion Financial Services, Ltd., Defendant.**

No. 4:99–1010–23.

United States District Court,
D. South Carolina,
Florence Division.

July 19, 2000.

Robert T. King, Wilcox, Buyck & Williams, Florence, SC, for plaintiff.

Jefferson Boone Aiken, III, Florence, SC, for defendant.

## *ORDER*

DUFFY, District Judge.

Plaintiff, a ninety-year-old woman, brings claims against defendant, a coin dealer, relating to defendant's possession of plaintiff's 914 $20 St. Gaudens gold

coins. Both parties have moved for summary judgment. The defendant's motion is granted in part, and denied in part. Plaintiff's motion is denied. All claims, with the exception of the claim for breach of fiduciary duty, remain for resolution at trial.

## I. FACTUAL BACKGROUND

Plaintiff, Lorraine Williams–Garrett, was born on September 11, 1909. Several years ago, Ms. Williams–Garrett began collecting coins as a hobby and for investment purposes. She considered herself an amateur collector, and by no means compared her knowledge of the coins and precious metals market to that of a professional. She placed all of the coins she purchased in safe-deposit boxes at local banks. She had never sold or traded any of her coins, save her first purchase of gold coins which was made shortly after it became legal to buy gold coins. Her only coin dealings up until the fall of 1998 had been purchases.

Defendant, Lynn Murphy, is a coin dealer now located in North Carolina. Beginning sometime in 1995, Mr. Murphy began contacting Ms. Williams–Garrett regarding the purchase of coins. Mr. Murphy obtained her name from a customer list which he had purchased from other dealers, and first visited her in 1996 in Mullins, South Carolina. Ms. Williams–Garrett took Mr. Murphy and his girlfriend, who had accompanied him on his trip with the ultimate destination of Charleston, to church for a chicken-bog lunch. After lunch, Ms. Williams–Garrett purchased some coins from Mr. Murphy. She did, at least on one occasion, seek Mr. Murphy's advice regarding a purchase that she had made, and Mr. Murphy, at least on one occasion, invited Ms. Williams–Garrett to consult with him before making any further purchases.

Some time prior to June of 1998, Ms. Williams–Garrett sold a significant amount of stock in a local corporation, and purchased 914 $20 St. Gaudens gold coins from International Rarities Group for $732,000.00. As was her custom, she placed those coins in her safe-deposit boxes. She viewed the transaction as one which would provide her future security; moreover, she had heard much ado about the impending Y2K crisis, and heeded, reasonably or unreasonably, those warnings.

Mr. Murphy, by this time, had given his customer list to two individuals in California, Bradford Kaye and Rahmaan Robertson (aka Eric Fontaine).[1] Kaye and Robertson were to contact Mr. Murphy's clients to inquire about possible sales, and then conduct any such sales through Mr. Murphy. The three agreed to evenly split any commission.

According to Mr. Murphy, Kaye or Robertson contacted Ms. Williams–Garrett and learned that she had recently purchased a number of $20 St. Gaudens coins. They allegedly discussed with her the possibility of trading the coins she had recently purchased for other more valuable coins. On November 19,1998, Mr. Murphy drove to Mullins, South Carolina to meet with Ms. Williams–Garrett. Mr. Murphy drove Ms. Williams–Garrett to the bank, and they removed the 914 $20 St. Gaudens coins from her safe-deposit box. They then drove back to Ms. Williams–Garrett's home.

At this point, Mr. Murphy and Ms. Williams–Garrett's accounts of what transpired diverge. Ms. Williams–Garrett claims that she only allowed Mr. Murphy to bring the coins back to her house so that he could examine them more closely. She denies ever having discussed him taking or trading the coins. However, according to Ms. Williams–Garrett, Mr. Murphy never brought the coins inside her

---

1. According to Ms. Williams–Garrett, a man named Eric sent her a toy poodle from California. She had never met Eric, but had spoken with him on the telephone a few times. Apparently, he was interested in her purchasing some platinum coins. Pl.'s Dep. at 39–40.

home to do that examination. Instead, she claims that once they pulled into her driveway, she got out of the car and began walking to her door. Then, Mr. Murphy drove away with the coins still in the backseat.

Mr. Murphy tells a different story. He asserts that both he and Ms. Williams–Garrett discussed his trading the coins, which was the reason they went to the bank to retrieve them. After having lunch together, they drove to the bank and removed the coins from the safe-deposit box. Mr. Murphy claims that he promised to come back in a few days with some coins in trade and that Ms. Williams–Garrett agreed to the transaction because that was what she wanted to do.

It is undisputed that Ms. Williams–Garrett did not notify anyone that Mr. Murphy had absconded with her coins. In deposition, she explained that she did not notify anyone because she thought Mr. Murphy would be contacting her soon.

In the days after obtaining the coins, Mr. Murphy contacted U.S. Coins in Houston, Texas for the purpose of trading the coins for other allegedly more valuable coins. It appears that Mr. Murphy traded approximately 555 of the coins. Additionally, Mr. Murphy obtained some Russian Roubles from National Gold Exchange, allegedly, to complete the deal. In total, it appears that Mr. Murphy valued Ms. Williams–Garrett' 914 $20 St. Gaudens gold coins at approximately $537,000, and went out and purchased/traded rarer coins totaling that value. However, Ms. Williams–Garrett maintains that Mr. Murphy overstated the value of the coins which he brought her in return.

On two visits to Mullins, South Carolina, November 30, 1998 and December 21, 1998, Mr. Murphy delivered the coins he obtained from U.S. Coins and National Gold Exchange to Ms. Williams–Garrett. Ms. Williams–Garrett had no recollection of meeting with Mr. Murphy on either of these dates at the time of her deposition. However, according to the bank records

and Mr. Murphy, it appears that on the November 30, 1998 visit, Mr. Murphy, Ms. Williams–Garrett and her nephew and lawyer, Reynolds Williams, went to lunch and then the three of them traveled to the bank to place the coins Mr. Murphy had brought with him in the safe-deposit box. Additionally, Ms. Williams–Garrett closed two of her safe-deposit boxes at that time.

On December 22, 1998, Mr. Murphy returned to Ms. Williams–Garrett's home. Both went again to the bank where Ms. Williams–Garrett opened her safe-deposit box and deposited the coins brought to her that day by Mr. Murphy.

Despite the lack of Ms. Williams–Garrett's recollection, it appears that in January of 1999, Ms. Williams–Garrett was contacted by Kaye or Robertson regarding another proposed sale. Ms. William–Garrett agreed to purchase coins from Mr. Murphy at a price of $69,500. Mr. Murphy paid only $48,500 for those coins. On January 4, 1999, Ms. Williams–Garrett wrote a check for $72,500, which was canceled for insufficient funds. She, thereafter, forwarded $69,500 in the form of a cashier's check.

It is undisputed that it was not until January 15, 1999 that Ms. Williams–Garrett received anything in writing pertaining to the coins. After receiving the January 15, 1999 letter and invoices, Ms. Williams–Garrett asked Mr. Williams to assist her because she was unsure of what had transpired and felt unable to handle the matter. After examining the coins in Ms. Williams–Garrett's safe-deposit box on January 22, 1999, Mr. Williams wrote to Mr. Murphy and informed him that Ms. Williams–Garrett had not agreed to the trade, that Ms. Williams–Garrett was rejecting any proposed trade, and that Ms. Williams–Garrett wished to have her coins returned. Mr. Williams informed Mr. Murphy that Ms. Williams–Garrett was safely storing the coins in her safe-deposit box, and was ready, willing and able to return them to him. Mr. Murphy main-

tained that the trade was a completed transaction, and that he was not willing to return the 914 $20 St. Gaudens-coins.

Furthermore, the parties dispute the state of Ms. Williams–Garrett physical and mental health at the time all of these "transactions" took place.

## II. SUMMARY JUDGMENT STANDARD

To grant a motion for summary judgment, this court must find that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The judge is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All evidence should be viewed in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123–24 (4th Cir.1990). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir.1991). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. The "obligation of the non-moving party is 'particularly strong when the non-moving party bears the burden of proof.'" *Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir.), *cert. denied*, 516 U.S. 870, 116 S.Ct.

190, 133 L.Ed.2d 126 (1995) (quoting *Pachaly v. City of Lynchburg*, 897 F.2d 723, 725 (4th Cir.1990)). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548.

## III. ANALYSIS

### A. Conversion

■ Ms. Williams–Garrett alleges that Mr. Murphy converted her coins by taking possession of them without her permission and by his subsequent act of trading them. Both Ms. Williams–Garrett and Mr. Murphy have moved for summary judgment on this claim. However, due to the irreconcilable differences in alleged facts regarding what actually transpired with respect to the plaintiff's coins, summary judgment is not appropriate.

■ "Conversion is a tortious act, and may arise either by wrongful taking of chattel or by some other illegal assumption of ownership, by illegally using or misusing it, or by wrongful detention." *Castell v. Stephenson Finance Co.*, 244 S.C. 45, 135 S.E.2d 311, 313 (1964) (citation omitted). The tort of conversion consists of a party who assumes and exercises an owner's rights in personal property. *Powell v. A.K. Brown Motor Co.*, 200 S.C. 75, 20 S.E.2d 636, 637 (1942). Plaintiff has set forth testimony which, if taken as true, would establish the tort of conversion. Defendant has offered nothing but his contrary testimony to rebut plaintiff's allegations. On the flip side, viewing the facts in the light most favorable to the defendant, plaintiff's motion for summary judgment on the claim of conversion is not warranted either. Defendant has submitted testimony, which if taken as true, would establish that the plaintiff gave defendant permission to take and trade her coins for more valuable coins. Summary judgment is not the device with which to decide the credibility or veracity of material facts.

Mr. Murphy also contends that Ms. Williams–Garrett is estopped from asserting a claim for conversion because he surrendered rare coins, purchased with his own funds in exchange for the 914 $20 St. Gaudens gold coins, to Ms. Williams–Garrett on his visits to Mullins in November and December of 1998. While equitable estoppel can preclude a claim for conversion, Mr. Murphy has failed to establish the elements of estoppel as a matter of law. He would have to establish that (1) he lacked knowledge and the means of knowledge that Ms. Williams–Garrett deemed his possession wrongful; (2) he relied upon Ms. Williams–Garrett's conduct to contrary; and (3) he prejudicially changed his position. *See Howard v. South Carolina National Bank*, 288 S.C. 421, 343 S.E.2d 41, 44 (App.1986). First, Ms. Williams–Garrett stated in her sworn deposition that she never gave Mr. Murphy any indication or made any statement which would have led him to believe that she wanted to trade her gold coins for other rare coins. In fact, she maintains that she gave him permission to take possession of the coins for the sole purpose of examining and evaluating them. Furthermore, whether Mr. Murphy's alleged return of the rare coins in November and December of 1998 was actually prejudicial to his interests is a question of fact. There is conflicting evidence concerning the value of both Ms. Williams–Garrett's original gold coins and the coins brought to her in November and December of 1998.

For these reasons, Mr. Murphy cannot avail himself of the defense of equitable estoppel, and his motion for summary judgment fails as a matter of law.

## B. Breach of Trust/Breach of Fiduciary Duty

Plaintiff has set forth a claim entitled "Breach of Trust." And, while the court recognizes that there is no civil cause of action entitled such, it has been correctly construed by both parties as a claim for breach of fiduciary duty. Therefore, with cross-motions for summary judgment before it, the court must determine whether, as a matter of law, such a duty existed between Ms. Williams–Garrett and Mr. Murphy, and if so, whether there is any evidence of the breach thereof.

In South Carolina, "a confidential or fiduciary relationship exists when one reposes a special confidence in another so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interest of the one reposing the confidence." *Chapman v. Citizens and Southern Nat'l Bank of South Carolina*, 302 S.C. 469, 395 S.E.2d 446, 451 (App.1990) (*quoting SSI Medical Servs., Inc. v. Cox*, 301 S.C. 493, 392 S.E.2d 789, 794 (1990)). Because the fiduciary duty is one which requires a high degree of care and consideration due the person to whom the duty is owed, only certain relationships carry with them this type of duty. For example, lawyers owe a special duty to their clients. *See e.g., Hotz v. Minyard*, 304 S.C. 225, 403 S.E.2d 634, 637 (1991). The courts have also found special duties owed by real estate brokers to their clients, *see e.g., Lengel v. Tom Jenkins Realty*, 286 S.C. 515, 334 S.E.2d 834, 836 (App.1985), by partners to other partners, *see e.g., Lawson v. Rogers*, 312 S.C. 492, 435 S.E.2d 853, 857 (1993), and by officers of a corporation to its shareholders, *see e.g., Talbot v. James*, 259 S.C. 73, 190 S.E.2d 759, 764 (1972).

"A fiduciary duty exists when a person places *special* trust or confidence in another." F. Patrick Hubbard and Robert L. Felix, The South Carolina Law of Torts, 66 (2d. ed.1997) (emphasis in original). As a general rule, mere respect for another's judgment or trust in his character is usually not sufficient to establish such a relationship. *Burwell v. South Carolina National Bank*, 288 S.C. 34, 340 S.E.2d 786, 790 (1986). The facts and circumstances must indicate that the one reposing the trust has foundation for his belief that the one giving advice or presenting arguments is acting not in his own behalf, but in the

interests of the other party *Id.* (citing 36A C.J.S. Fiduciary (1961)).

In her memorandum in support of summary judgment, Ms. Williams–Garrett maintains that such a relationship existed between she and Mr. Murphy because she reposed a significant amount of trust in him with respect to the coin dealings. Furthermore, she claims that Mr. Murphy invited that trust as is evidenced by a letter offering to counsel her on her coin dealings. *See* Pl.'s Dep. Ex. 8. It is also undisputed that Ms. Williams–Garrett is an elderly woman, and a novice in the coin trade.

However, Ms. Williams–Garrett fails to present any evidence that she placed any special trust in Mr. Murphy or that she believed he was acting on her behalf in contrast to his own interests. When asked to describe her relationship with Mr. Murphy in her deposition, Ms. Williams–Garrett responded that "[t]here wasn't much of a relationship." Pl.'s Dep. at 60. Furthermore, she only recalled meeting or having a discussion with him two or three times. *Id.* Nothing in Ms. Williams–Garrett's deposition testimony indicates that she considered Mr. Murphy anything other than a nice person whom she trusted. She did not believe he was working for her or with her interests in mind. Pl.'s Dep. at 77. And, when he allegedly drove off with her 914 $20 St. Gaudens gold coins, she stated that the reason she did not notify either the police or her family was because she just thought he would probably call her. Pl.'s Dep. at 29.

Furthermore, the affidavit submitted by Mr. Williams makes the totally unsupported legal conclusion that "Lynn Murphy was a fiduciary," and that his aunt "relied upon Lynn Murphy's expertise and good faith." While it may be that, as Mr. Williams states in his affidavit, he has testimony to offer "which would be helpful to the Plaintiff," he has yet to offer such testimony. And, without any supporting facts indicating that the plaintiff, herself, placed a special trust in the defendant, the court, as a matter of law, cannot allow a claim for breach of fiduciary duty to go before a jury. Unsupported factual assertions are insufficient to raise a material question of fact. Therefore, summary judgment for the defendant is appropriate on this claim.

## C. Exploitation under the Omnibus Adult Protection Act

Plaintiff asserts that a private cause of action exists against Mr. Murphy for violation of the South Carolina Omnibus Adult Protection Act, S.C.Code Ann. §§ 43–35–5 to 43–35–350 (Supp.1999). The Omnibus Adult Protection Act is a statute enacted to prevent the abuse and exploitation of vulnerable adults, who in turn, are defined generally as adult individuals who have "a physical or mental condition which substantially impairs the person from adequately providing for his or her own care or protection." *See* S.C.Code Ann. § 43–35–10(1). The Act generally calls for administrative and regulatory investigative procedures, sets forth reporting requirements, and criminalizes the abuse, neglect and exploitation of vulnerable adults. It contains no provision which explicitly creates a private cause of action.

Plaintiff labels her claim under the Act as one for negligence *per se*. However, because Ms. William–Garrett is unable to state with sufficient clarity what Mr. Murphy had a duty to do, she is effectively seeking to establish, not that Mr. Murphy violated some duty of care to her, but rather that his actions or failures to act constituted abuse, neglect, or exploitation as those terms are defined under the Act. Whether a statute imposes a duty of care implicating a negligence cause of action or whether a statute creates a private cause of action for the violation of its provisions are two different matters. To determine when a duty created by a statute will support an action for negligence, the plaintiff must show: (1) that the essential purpose of the statute is to protect from the kind of harm the plaintiff has suffered;

and (2) that the plaintiff is a member of the class of persons the statute intended to protect. *Rayfield v. South Carolina Dept. of Corrections,* 297 S.C. 95, 374 S.E.2d 910, 914 (App.1988). In this case, the Omnibus Adult Protection Act does not require action on the part of the defendant, but instead, in addition to other regulatory matters, criminalizes certain conduct. Therefore, the court must determine whether the legislature intended for the Act to establish a basis for civil liability. *See Whitworth v. Fast Fare Markets of South Carolina, Inc.,* 289 S.C. 418, 338 S.E.2d 155, 156 (1985). In *Whitworth,* the court stated:

> The legislative intent to grant or withhold a private cause of action for the violation of a statute, or the failure to perform a statutory duty, is determined primarily from the form or language of the statute.... In this respect, the general rule is that a statute which does not purport to establish civil liability, but merely makes a provision to secure the safety or welfare of the public as an entity is not subject to a construction establishing civil liability.

*Id.* (citing § 73 Am.Jur.2d. Statutes 4322 (1974)). The search for the legislative intent comports with the standards used for testing federal rights of action as expressed by the Supreme Court in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). In *Cort v. Ash,* the Court considered whether the plaintiff is "one of the class for whose especial benefit the statute was enacted;" whether there is evidence that the Legislature intended to create a private cause of action under the statute; and whether implication of a private cause of action is "consistent with the underlying purposes of the legislative scheme." *Id.* at 78, 95 S.Ct. 2080. *See also Crusco v. Oakland Care Ctr., Inc.,* 305 N.J.Super. 605, 702 A.2d 1363, 1368–69 (1997) (no private cause of action for wrongful discharge by an employee alleging retaliation for reporting elder abuse).

Because no South Carolina court has addressed any provision of the Omnibus Adult Protection Act, this court is left only with the form and language of the Act. The Omnibus Adult Protection Act protects the mentally and physically infirm. It focuses on the creation of state-funded programs designed to facilitate investigation of abuse and exploitation of vulnerable adults. It sets forth reporting requirements for those who work in the public health and law enforcement fields, and establishes criminal penalties for violations of its various provisions. With respect to civil enforcement, the Act contains only two references: first, in the preamble where it states that one of its ten purposes of the Act is "to provide civil and criminal penalties for abuse, neglect, and exploitation," S.C.Code Ann. § 43–35–5(9); and second, in a provision allowing action by the Attorney General against persons or facilities for the failure to exercise reasonable care, *see id.* § 43–45–80. Section 43–35–80(A) provides, in relevant part that

> [n]otwithstanding any regulatory or administrative penalty that may be assessed and in addition to a private cause of action that may be brought against a person or facility based on an action or failure to act that otherwise constitutes abuse, neglect, or exploitation under this chapter, the Attorney General ... may bring an action against a person who fails through a pattern or practice to exercise reasonable care in hiring, training, or supervising facility personnel or in staffing or operating a facility and this failure results in the commission of abuse, neglect, exploitation, or any other crime against a vulnerable adult in a facility.

For violation of subsection (A), the court may assess a fine up to $30,000 or order injunctive relief, or both, or may order relief as the court considers appropriate. *Id.* § 43–35–80(B). The Act further provides that nothing in section 43–35–80 "may be construed to create a private cause of action against one who fails through a pattern or practice to exercise

reasonable care as provided for in subsection (A)." *Id.* § 43–35–80(C).

■ In light of the language in section 43–35–80, the court concludes that the legislature intended to create a private cause of action under the Act. Subsection (A) expressly references a private cause of action for the act of abusing, neglecting, or exploiting as defined in the Act generally. And, while this reference is not forthright in its intent to actually create and define a private cause of action, its inclusion in the section for civil enforcement by the Attorney General does not render the reference extraneous. Furthermore, in subsection (C) the legislature expressly prohibited a private cause of action for failure through a pattern or practice to exercise reasonable care in hiring, training, or supervising facility personnel or in staffing or operating a facility if this failure results in the commission of abuse, neglect, exploitation, or any other crime against a vulnerable adult in a facility. In this provision, the legislature sought to limit civil liability on the part of an entity, such as an "employer," to enforcement by the Attorney General. Accordingly, the legislature knew how to preclude a private cause of action and did not do so other than with respect to private causes of action for the failure to use reasonable care in the hiring, training, or supervising facility personnel or in staffing or operating a facility.

It is also clear that the Act was created for the benefit of those persons falling within the definition of vulnerable adults. The express purpose of the act is, in part, "to address the continuing needs of vulnerable adults," and "to uniformly define abuse, neglect, and exploitation for vulnerable adults in all settings." S.C.Code Ann. § 43–35–5(4), (5). "Vulnerable adults" include those persons "impaired in the ability to adequately provide for the person's own protection because of the infirmities of aging, including but not limited to, organic brain damage, advanced age, and physical, mental, or emotional dysfunction." *Id.* § 43–35–10(11). And, "exploita-

tion" is defined, in part as "an improper, illegal, or unauthorized use of funds, assets, [or] property … of a vulnerable adult by a person for the profit or advantage of that person or another person." *Id.* § 42–35–10(3)(b). And, lastly, private civil enforcement would be consistent with the underlying purposes of the Act. Civil enforcement to hold liable those who exploit vulnerable adults is entirely consistent with the underlying purpose of protecting those individuals.

■ However, a finding that a private civil cause of action exists against the defendant for the actions he allegedly took with regard to Ms. Williams–Murphy fails to determine liability under the Act. Whether Ms. Williams–Murphy actually was a vulnerable adult at the time of the acts in question is clearly a question of fact incapable of being answered as a matter of law. Both parties dispute the state of Ms. Williams–Murphy's mental and physical state in 1998, and the medical evidence presented in support of summary judgment fails to establish the same. Furthermore, in light of the contested facts surrounding the actual events of the coin "transaction," whether Mr. Murphy's actions constituted abuse, neglect or exploitation under the Act also remains a question of fact.

## D. Uniform Commercial Code Remedies

■ Plaintiff brings the alternative claim that if it is determined a contract for the trade/sale of the coins existed between she and Mr. Murphy, then she is entitled to certain remedies under the Uniform Commercial Code because she properly rejected the goods or effectively revoked her acceptance of the goods. *See* S.C.Code Ann. §§ 36–2–601, 36–2–608. A party is entitled to plead alternative theories of relief, but simply may not recover for both. *Save Charleston Foundation v. Murray,* 286 S.C. 170, 333 S.E.2d 60, 64 (App.1985).

However, in order for the court to make any determination with respect to remedies due under the UCC, it must be established as a matter of law that an enforceable contract existed between Ms. Williams–Garrett and Mr. Murphy. In order for there to be a binding contract, "there must be a mutual manifestation of assent to the terms." *Potomac Leasing Co. v. Otts Market, Inc.*, 292 S.C. 603, 358 S.E.2d 154, 156 (App.1987). Moreover, "the assent must be as to all the terms of the contract and some terms are considered indispensable to a binding contract. Among these are price, time and place." *Id.* Additionally, the statute of frauds provides that all contracts for the sale of goods for a price in excess of $500 is not enforceable unless there is some writing sufficient to indicate that a contract for sale has been made which writing is signed by party against whom enforcement is sought. *See* S.C.Code Ann. § 36–2–201(1).

In light of the disputed facts surrounding what actually occurred, a determination as a matter of law that a binding contract existed is impossible. Ms. Williams–Garrett maintains that she never discussed trading her coins with Mr. Murphy and that they only removed them from the safe-deposit box and brought them to her home so that Mr. Murphy could examine them more closely. Mr. Murphy has failed to produce a written contract signed by Ms. Williams–Garrett, and has failed to establish that any of the exceptions to the writing requirement apply. *See id.* § 36–2–201(2)–(3). Furthermore, Ms. Williams–Garrett has no recollection of Mr. Murphy bringing her rare coins in exchange for her 914 $20 St. Gaudens gold coins. Neither does she recollect purchasing additional coins from him in January of 1999. While it may turn out that Ms. Williams–Garrett's lack of recollection of the "transaction" will prevent her from prevailing on the merits of her case, Mr. Murphy's unsupported explanation of the intentions of the parties is insufficient, as a matter of law, to conclude that an enforceable contract existed.

Without proof of the existence of a contract subject to the provisions of the UCC, this court is unable to determine the availability of any such remedies. Summary judgment is therefore inappropriate on the contract claim.

### E. Unfair Trade Practices Act

The South Carolina Unfair Trade Practices Act, S.C.Code Ann. §§ 39–5–10 to 39–5–350 (Law.Co-op.1985), was created to prevent unfair or deceptive acts in the conduct of trade or commerce. *Id.* § 39–5–20(a). "Trade" and "commerce" are defined to

include the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State.

*Id.* § 39–5–10(b). The present case arises from an alleged coin trade which took place between Mr. Murphy and Ms. Williams–Garrett. Under the SCUTPA, a trade practice is unfair "when it is offensive to the public policy or when it is immoral, unethical, or oppressive," *Young v. Century Lincoln–Mercury*, 302 S.C. 320, 396 S.E.2d 105, 108 (App.1989), *rev'd on other grounds*, 309 S.C. 263, 422 S.E.2d 103 (S.C.1992), and often involves misrepresentations to consumers, *Wingard v. Exxon Co., U.S.A.*, 819 F.Supp. 497, 506 (D.S.C.1992).

Plaintiff alleges that the defendant engaged in unfair and deceptive acts by taking advantage of an elderly lady's trust, failing to disclose material elements to a commercial transaction, misrepresenting the nature and quality of the coins he traded, and by unreasonably inflating the price of those coins in order to gain additional profit. Furthermore, plaintiff asserts that the defendant has violated the directives issued to him in a permanent injunction by a federal judge in Arizona.

*See* Pl.'s Ex. 1 (Entry of Judgment and Order for Entry of Monetary Judgment and to Pay Redress Against Defendants Lynn Murphy and Company, Inc., Lynn Murphy and Bradford Kaye).

■■■■ Furthermore, "to be actionable under the SCUTPA, the unfair or deceptive acts or practices must have an impact upon the public interest." *York v. Conway Ford, Inc.,* 325 S.C. 170, 480 S.E.2d 726, 728 (1997) (citing *Haley Nursery Co. v. Forrest,* 298 S.C. 520, 381 S.E.2d 906, 908 (1989)). A practice affects the public interest if the acts or practices have the potential for repetition. *Id.* And, past practices can serve as the predicate for a violation of the SCUTPA. *Wingard,* 819 F.Supp. at 505. In 1988, Mr. Murphy was sued by the Federal Trade Commission for defrauding customers through improper grading practices, misrepresenting the nature and quality of coins, and improper leveraging practices. The suit resulted in a default judgment against the defendant in the amount of approximately $6,000,000. In addition to the monetary judgment, the court imposed upon the defendant a permanent injunction, which set forth strict guidelines on how he was to conduct future coin transactions. The court enjoined the defendant from, among other things, misrepresenting the market value of any coins, misrepresenting the appreciation potential for coins, misrepresenting the potential profitability of coins without a prominent disclaimer, and misrepresenting "any other fact material to a consumer's decision to purchase coins...." *See* Pl.'s Ex. 1.

Defendant asserts that because his actions were compliant with the standards set forth in the UCC, he is shielded from liability under the SCUTPA. However, the court fails to see how such would shield the defendant from potential liability. Notwithstanding the illogical grounds for such an argument, as discussed *infra.*, it has yet to be determined whether the UCC is applicable to the transaction at issue. Nonetheless, the plaintiff's is not entitled to summary judgment on this claim either as she has yet to establish the wrongfulness of the defendant's actions. Therefore, summary judgment is inappropriate.

## *IV.  CONCLUSION*

It is, therefore,

· **ORDERED,** for the foregoing reasons that the defendant's motion for summary judgment is **GRANTED IN PART, DENIED IN PART** and the plaintiff's motion for summary judgment is **DENIED.** All claims, except the claim for breach of fiduciary duty, remain for resolution at trial.

**AND IT IS SO ORDERED.**